**FROSTY MORN MEATS, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 18464.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1961.

John C. Godbold, Euel A. Screws, Jr., Montgomery, Ala. (Godbold, Hobbs & Copeland, Montgomery, Ala., of counsel), for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Vivian A. Asplund, Atty., Stuart Rothman, Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C., for respondent.

618

Before CAMERON and WISDOM, Circuit Judges, and CHRISTENBERRY, District Judge.

WISDOM, Circuit Judge.

█ Petitioner, Frosty Morn Meats, Inc., an Alabama corporation, is engaged in the slaughtering and processing of beef and the processing of beef by-products. The National Labor Relations Board found petitioner guilty of unfair labor practices under Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 3). The Board issued its usual cease and desist order and also ordered the petitioner to reinstate with back pay, Sam Judkins, the employee whose discharge was the basis for the 8(a) (3) finding. Frosty Morn Meats petitions this Court to review and set aside that portion of the order requiring the reinstatement of Judkins. We hold that the evidence does not support the Board's 8(a) (3) finding, and grant the petition.

Here, as in all discriminatory discharge cases, the Court must take a close look at the facts. Here, as in almost all of these cases, there is clear evidence of the employer's animus against unions and clear evidence of good cause for the employee's discharge.

The Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, the complainant in those proceedings, presented evidence showing animus of the employer against the union and against Judkins and another discharged employee, Hughie Shaw. In October 1958 a movement developed in the company plant to establish a union. Judkins and Shaw were its principal leaders. Judkins obtained union cards for the employees and arranged for a meeting Saturday, November 1 to discuss unionization. Plant Manager J. W. Camp and his assistant J. T. Bigger sharply opposed these unionization activities. Several employees testified that when they gathered to go to the November 1 meeting Bigger was near by watching them. Four of the employees stated that the following Monday morning they were called into Camp's office, where Camp interrogated them as to their activities regarding the union and told them not to vote for the union if there was an election. He threatened to close down the plant rather than to admit a union. William McKeithen, a former employee, testified that Camp approached him Friday, October 31, and said, "William, I want you to find out if Preacher Shaw and Sam Judkins are organizing a union. I want you to find that out, and tell me tomorrow." "If they are organizing a union, I will fire them; because there isn't going to be no union at Frosty Morn." When McKeithen reported the next day that Shaw and Judkins said they did not know anything about the union, Camp said, "They are lying." "They are the ones organizing the union." "I'll fire them. Before there will be a union at Frosty Morn, I'll close it down." Bigger discharged Judkins November 4 following his failure to perform a sweeping chore assigned to him.[1]

Frosty Morn Meats asserts that it discharged Judkins for cause, relying on the testimony of several witnesses that Judkins was not a satisfactory worker. Judkins worked in the Company's ship-

1. Shaw was discharged November 6 for violation of a company rule against killing more than two steers in one pen at a time. The Union complained that both discharges constituted violations of Section 8(a) (3) and also that the Company had violated Section 8(a) (1) by its surveillance and interrogation of the employees concerning the movement to establish a union in the plant. The trial examiner found for the Union on all three counts. The Board concluded that the evidence did not support the finding that the discharge of Shaw was a Section 8(a) (3) violation, but it accepted the trial examiner's findings on the other two questions. Frosty Morn Meats concedes that there is evidence in the record to support the finding of the Section 8(a) (1) violation. The only ruling appealed from therefore is the order concerning the discharge of Judkins.

ping department where workers give the beef a final dressing, store it temporarily, and as orders come in load it into trucks and trailers. In loading, the beef is pushed manually while it is hanging from an overhead rail, and at the end of the loading platform the workers cut it from the rail for loading onto the truck. Since pieces of fat, blood, and waste continuously drip from the beef, it is necessary to sweep the floor frequently and to apply fresh sawdust. Often one man is asked to sweep the floors after a loading has been completed while the others have a break, and that man takes his break after he finishes the sweeping.

J. T. Bigger, a supervisor, fired Judkins November 4. Bigger testified that after a trailer was loaded that morning he told Judkins "to clean up the dock and so forth." A few minutes later he noticed that Judkins was not cleaning up the dock and went to look for him in the cooler thinking that he might be sweeping that out first. Judkins was not there. Bigger found him coming out of the dressing room and said to him: "Sam, you haven't cleaned up like I told you. It seems like you are not going to do like we want you to and do a good job, and so I think that you had better be on your way; we don't need you anymore." Judkins, however, testified that he followed the instructions to sweep the floor and then reported to Bigger. Asked whether he completed the sweeping, he answered, "I certainly did", and when asked who was around when he did the sweeping, he stated that Luther Hall was sitting at the back of the cooler eating a sandwich. Judkins stated that he had swept only the cooler and not the loading platform because that was all Gates had asked him to do. Luther Hall flatly contradicted this testimony, stating that he left the cooler at the time Judkins was told to clean it and that he was not in the cooler eating a sandwich when Sam was sweeping. Willie Gene Majors also contradicted the testimony, stating that Judkins did not sweep out the loading dock or the cooler that day. When Big-

ger told Judkins that he was going to discharge him, Judkins, according to both versions, said "All right; have you got my money ready?" He received his money and left without asking the reason for his dismissal.

Johnny Gates was the senior member of the shipping crew and in the absence of Bigger sometimes took charge of supervising the men. The sweeping job was rotated, and Gates took his turn in doing it. Gates stated that two or three days before Judkins was fired he had instructed him to sweep up but that when he came back from the break Judkins had not done so. He said that he had reported this to Bigger. Gates also testified that although Judkins had worked well initially, "it seemed like he slowed down and just didn't do as good a job as he did when he first started." "[I]t seemed like that he wasn't as fast [as] he was before, I mean, he slowed down; and we would be pushing cattle in the coolers, and he got to where he wouldn't watch where he was going, just push the cattle right on them." "[I]t is pretty dangerous pushing those cattle. I mean, you can run over somebody if you don't watch what you are doing; and he would just put his head down and start pushing, and it didn't make no difference who was in front of him." Willie Gene Majors, one of Judkins's fellow workers who talked with him about union activities and signed a union card, also testified that Judkins was not a good worker. He said that when Judkins first started working, he "was a good worker—big and strong" but that "after awhile he became sullen, and he didn't like some of the things that he had to do." He said that Judkins was dangerous in pushing meat too fast, and that while other workers sometimes had pushed the meat too fast "[t]here weren't [any] that bad. They were wild, but not that bad."

Bigger testified that while Judkins's failure to sweep up as instructed was the specific incident prompting his discharge several other matters corroborated the decision to fire him. Bigger stated

that Judkins was a temporary employee hired about eight weeks previously[2] who had not proved to be a good worker; that Judkins tended to have moody spells when he did not cooperate well and "would shove the beef into the other men to apparently irritate them." Judkins, he testified, also had financial problems, and the Company had been bothered several times by having bill collectors come to see him at the plant. He said that the financial problems were not specifically a reason why he fired Judkins, "but it was an accumulation of that type of things, and specifically for not obeying instructions."

The initial burden of proof lies on the General Counsel to present substantial evidence that the discharge came from improper motives. N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir., 1955, 222 F.2d 341. Once this burden is met, the primary function of determining the factual question lies with the Board. Under the substantiality test of Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, we may displace the Board's choices but only if there is an absence of substantial evidence on the record considered as a whole. To determine whether the employer has committed an unlawful discrimination, the courts regularly have looked to the motivation, and when conflicting evidence has been offered as to whether the motive was one of just cause or anti-union animus the inquiry has been pursued to find the dominant motive or the moving force. If an employer motivated by anti-union design discharges an employee, he has violated the statute even though the employee has performed misdeeds which would warrant his dismissal. E.g., N. L. R. B. v. C. & J. Camp, Inc., 5 Cir., 1954, 216 F.2d 113. But if an employee is discharged for cause, the fact that the employer harbors an antipathy toward the employee grounded in anti-unionism does not make the discharge unlawful. E.g., N. L. R. B. v. Birmingham Publishing Company, 5 Cir., 1959, 262 F.2d 2.

The evidence that Camp and Bigger vigorously opposed the unionization movement led by Judkins, Camp's statements that the plant would be shut down rather than allow a union to come in, and his specific threat to McKeithen that he would fire Judkins and Shaw support an inference that Judkins's discharge was in response to his union leadership. On the other hand, the unchallenged testimony of several witnesses, including fellow employees who signed union cards, that Judkins was a slow, uncooperative, and dangerous worker demonstrates not merely that there was good cause to justify firing Judkins but that it can scarcely be imagined that Judkins, irrespective of his union affiliations, would have been allowed to continue in his job. In the face of this uncontradicted and unimpeached testimony from Judkins's co-employees we cannot accept as valid the trial examiner's finding that "the Company seized upon the sweeping incident merely as an excuse to get rid of an active adherent of the Union."

When the evidence of the employee's misdeeds and the employer's anti-union bias is less striking, it is

2. There was a dispute in the testimony as to when Judkins was employed. Judkins testified that he was employed in July 1958. Frosty Morn Meats contended that he was not employed until September 6. It introduced Judkins's signed employment application, his signed withholding certificate, and his initial time card, all dated September 6, 1958, as evidence on this point. One witness testified that Judkins had been there "one or two months" when fired, another estimated his period of employment at "two or three months". The date was significant because the Company asserted before the trial examiner that Judkins had sought employment with Frosty Morn Meats as a "sleeper" to organize the union and introduced testimony that Judkins during July had talked with union officers about setting up a union at Frosty Morn Meats. The company asserts that Judkins's testimony on the date of his employment *is indisputably discredited and that Judkins's credibility as a witness is thereby impaired. We feel that the point has some merit but that it is of marginal significance in our disposition of the case.

sound to inquire whether union animus was *the* moving cause. If in the absence of a discriminating motive the employee would not have been fired, his discharge deprives him of a right he otherwise would have had to continue his job while participating in union activities. Such discharges make other employees apprehensive that if they join a union they endanger their jobs. The inquiry must be made even where the discharged employee has done something that might warrant his discharge, since if it is something that the employer might pass over in another instance the firing of the union employee can be discriminatory. If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part. The employee will not have been harmed by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. It must be remembered that the statute prohibits discrimination, and that the focus on dominant motivation is only a test to reveal whether discrimination has occurred. Discrimination consists in treating like cases differently. If an employer fires a union sympathizer or organizer, a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently.

When an employee gives his employer as much reason to fire him as Judkins did, by refusing to follow instructions and by giving not only his supervisors but also his fellow employees the impression that he was uncooperative, there is no basis for the conclusion that the employer has treated him differently than he would have treated a non-union employee. As a speculative matter, it may or may not be true that union animus loomed larger in the employer's motivation than Judkins's shortcomings as a worker. But when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion

that the discharged employee was deprived of any right because of union activities. The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job.

The order of the Board is enforced as to the 8(a) (1) violation. The order as to the 8(a) (3) violation is set aside.