**AVONDALE SHIPYARDS, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 24357.

United States Court of Appeals
Fifth Circuit.

Feb. 28, 1968.

204

Michael J. Molony, Jr., New Orleans, La., for petitioner; Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., (R. K. McCalla, New Orleans, La., on the brief).

Marcel Mallet-Prevost, Asst. Gen. Counsel, Harold B. Zanoff, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Paul J. Spielberg, Attys., N. L. R. B., Washington, D. C., for respondent.

Before RIVES and GODBOLD, Circuit Judges, and HUGHES, District Judge.

GODBOLD, Circuit Judge:

Avondale Shipyards, Inc. petitions for review of a decision and order of the National Labor Relations Board.[1] The Board accepted the findings of its Trial Examiner requiring reinstatement of six employees found to be discharged in violation of §§ 8(a) (1) and (3),[2] and, in addition, concluded that conversations with three employees violated § 8(a) (1). The Board cross-petitions for enforcement of its order.

Avondale employs approximately 6,000 in its shipyards at Harvey and Avondale, Louisiana. The union began its organizational campaign in March 1964 and by June 1965 had obtained approximately 900–1,000 authorization cards. On February 10, 1965 a letter was sent the company notifying it of the identity of 14 union committeemen. They were active union adherents. On March 1 or 2 the company was informed of an additional committeeman (Baker).

#### The § 8(a) (1) violations

 There need be no recital of the evidence of employee interrogation. It is more than adequate to reach the required standard of substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

#### The § 8(a) (3) violations

 Employees involved are Alford, Finch, Borne, Forbes, Baker and Boyd. All except Baker and Boyd were discharged or quit within a few days of the time their identity as committeemen was made known to the company in February. Baker was fired within three or four days of the time his identity was made known

---

1. 162 N.L.R.B. 40.

2. 29 U.S.C.A. §§ 158(a) (1) & (3).

on March 1 or 2. Boyd's discharge was on March 3.

The case of Alford, discharged on February 16, is not even close. It turns in considerable degree on credibility determinations which the Board was authorized to make. The order should be enforced as to him.

Finch quit his job on February 16. There is substantial exidence to support the Board's conclusion that he was forced to quit by statements of his supervisors, the nature of which, especially in light of Finch's known nervous condition, foreseeably would cause him to resign. NLRB v. Tennessee Packers, Inc., 339 F.2d 203 (6th Cir. 1964); NLRB v. East Texas Motor Freight Lines, 140 F.2d 404 (5th Cir. 1944); see Radio Officers Union v. NLRB, 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455, 479–480 (1954).

Forbes also quit, on February 17. There is substantial, in fact almost compelling, evidence from Forbes' credited testimony describing a conversation with his foreman, Betancourt, that Forbes was transferred to new work in the belief, and with the result, that he would quit rather than perform the new duties. NLRB v. Cone Bros. Contracting Co., 317 F.2d 3 (5th Cir.), cert. denied, 375 U.S. 945, 84 S.Ct. 353, 11 L.Ed.2d 275 (1963); Bausch & Lomb Optical Co. v. NLRB, 217 F.2d 575 (2d Cir. 1954).

Boyd was discharged on March 3 or 4 following his performance of work which was unsatisfactory. But whether it was defective because of his failure to read and follow blueprints or because of confusing instructions from the foreman was for the Board to determine, and its conclusion is supported by adequate evidence.

At the time of his discharge, March 5, Baker was assigned to a welding job in the bow of a barge. During the preceding two days his production had fallen to half the standard footage of welding expected of a welder. The position in which he was working on the discharge date required his welding machine to be placed some distance away and out of his sight. The Trial Examiner credited Baker's testimony that someone repeatedly tampered with the controls of his machine, causing the temperature to vary and requiring him to stop work to reset the machine, which slowed his production. The Trial Examiner's finding of discriminatory discharge was grounded on the theory that the company, having knowledge of Baker's difficulties with his equipment, failed to make a real investigation or to "make any allowances" for Baker's low production. The Trial Examiner did not credit Supervisor Nicholson's testimony that after Baker complained that someone was tampering with his machine he [Nicholson] watched it for an hour and saw no indication of the alleged interference. But there is no evidence that the company induced harassment of Baker or contributed to it. Compare NLRB v. Tennessee Packers, Inc., 339 F.2d 203 (6th Cir. 1964). Baker was a marginal employee, a chronically slow welder. His work had been the subject of numerous complaints, and of investigations by his supervisors after complaints (including investigations on February 16 and 26), and only a week before discharge he had been warned that if his work did not improve he would be discharged. All this occurred prior to any union activity on his part. The Board contends that when other welders were low in performance they were given assistance to improve. But from July, 1964 through March, 1965 the night welding superintendent, who discharged Baker, fired five welders for failing to meet production standards.[3]

The Trial Examiner omitted reference to Baker's undisputed past record of unsatisfactory performance and the warning a week before discharge that his work would have to improve.

Borne was a first-class machinist who had worked for the company for 13 years.

---

3. Between March, 1964 and March, 1965 approximately 2,100 employees left the company's employ, for all reasons including quits, lay-offs and discharges. Of this number, 740 were discharged for cause.

On February 18 he machined away too much of a metal casting and ruined it, and was discharged. The casting was not for routine shipbuilding but for use in a special construction job for the Coast Guard on which there was a penalty of $1,000 per day for delay in completion. The default was a serious one. The possible loss to the company was great. Before he commenced work on the casting Borne was reminded that the work had to be done with great accuracy. This is not the frequent case of an error by a union advocate in a routine daily task, blown up by the employer to a breach of holy writ, and minimized by the Board as of transitory, and nominal if any, significance. The matter was major.

■ Ultimately it developed that 12 weeks were required to secure a new casting and the job ran into the penalty period, but no penalty was assessed against the company. The Trial Examiner erred in considering the ultimate absence of a penalty as bearing on the motive for the discharge. We find no evidence that it was known or could be determined when Borne ruined the casting that a penalty would or would not ensue. But without dispute the work was on a penalty provision job, and it was clear that time was important in completing the project and that considerable time would be required to obtain a new casting.

■ We conclude that the discharges of Baker and Borne were not discriminatory conduct inherently destructive of employee interest. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), and NLRB v. Fleetwood Trailer, Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). Pretermitting discussion of whether the employer conduct was "discriminatory," a threshold consideration under the *Great Dane* analysis, these discharges were not conduct carrying with it "unavoidable consequences which the employer not only foresaw but which he must have intended," and it does not bear "its own indicia of intent." *Great Dane*, supra; NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

■■ Consequently under the burden described by *Great Dane* the employer was obliged to come forward with evidence of legitimate and substantial business justification for its conduct, and it did come forward. There being before the Board some evidence of anti-union motivation and very strong employer evidence of legitimate business justification, we then apply the test of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), to determine if the Board's conclusions were supported by substantial evidence, but we do not merely displace the Board's choice of conflicting inferences with our own. "Substantial evidence" does not mean "any evidence." "Insubstantial evidence" is not limited to "no evidence." Reiteration and distillations of guidelines for review do not make application of the appropriate standard a purely mechanical process devoid of applied judicial judgment.

Since the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment.

Id. at 489, 71 S.Ct. at 465, 95 L.Ed. at 468. We conclude that in the cases of Baker and Borne there was not substantial evidence that would justify Board conclusions that the discharges were because of union membership or activity.

Enforced as to the § 8(a) (1) violation. As to § 8(a) (3), enforced as to Alford, Finch, Forbes and Boyd, and denied as to Baker and Borne.