**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**GOODYEAR TIRE & RUBBER COMPANY RETREAD PLANT, Respondent.**

No. 24663.

United States Court of Appeals
Fifth Circuit.

May 6, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Solomon I. Hirsh, Atty., N.L.R.B., Washington, D. C., for petitioner.

Walter E. deBruin, Akron, Ohio, for respondent.

Before John R. BROWN, Chief Judge, and GEWIN and WRIGHT,* Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this case the Board petitions for enforcement of its order against Goodyear, the Employer, finding that it violated § 8(a) (1), (3), and (5) of the Act, 29 U.S.C.A. § 158(a) (1), (3), (5), and ordering Employer to cease and desist from engaging in unfair labor practices, to reinstate with back pay a discharged employee, and to recognize and bargain collectively with the Union. We enforce except as to one modification we make in the back pay and reinstatement order as to the dischargee. Except for that phase little need be said.

■ The Board's conclusion that the Employer violated § 8(a) (1) of the Act by coercively interrogating and economically threatening its employees requires no discussion. Credited as the facts were, the picture was one of crude, at times obnoxious threats breaking every rule in the now compendious book of how-not-to-combat-a-union-campaign. The facts were quite enough. See Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Avondale Shipyards, Inc. v. NLRB, 5 Cir., 1968, 391 F.2d 203 [Feb. 28, 1968].

■■ Likewise, the record also amply supports the conclusion that when the Employer was presented with union authorization cards signed by a majority of its employees, the Employer did not thereafter have a good-faith doubt as to the Union's majority. This Circuit, as do others, follows the rule that "an employer cannot refuse recognition pending an election unless it doubts in good faith that the union has a majority." Skyline Homes, Inc. v. NLRB, 5 Cir., 1963, 323 F.2d 642, 648; Retail Clerks Union etc. v. NLRB, 9 Cir., 1967, 376 F.2d 186; Borden Cabinet Corp. v. NLRB, 7 Cir., 1967, 375 F.2d 891, cert. denied, 389 U.S. 841, 88 S.Ct. 77, 19 L.Ed.2d 106.

* Circuit Judge of the D.C. Circuit, sitting by designation.

But see NLRB v. S. S. Logan Packing Co., 4 Cir., 1967, 386 F.2d 562.

■■ It may be true that a bargaining order in this situation, where no election has ever been held, is "strong medicine," NLRB v. Boot-Ster Mfg. Co., 6 Cir., 1966, 361 F.2d 325. But such an order is clearly within the Board's discretion, especially when the employer has engaged in unfair labor practices such as is the case here. See Franks Bros. Co. v. NLRB, 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; NLRB v. Delight Bakery, Inc., 6 Cir. 1965, 353 F.2d 344. It is equally so where the employer takes the bold course of refusing to bargain as the means of testing representation of a majority. Even more so is it when this intransigence flows from an inflexible company policy of ignoring authorization cards and insisting on a Board election as the price for bargaining. Of course, the fact that the Union's majority may have been dissipated during the pendency of the present action affords no defense to the employer. Such reasoning would allow the employer to profit by his own wrongdoing and would encourage, not discourage, the very activities which the law so plainly forbids. See D. H. Holmes Co. v. NLRB, 5 Cir., 1950, 179 F.2d 876; NLRB v. Delight Bakery, Inc., supra.

■ The § 8(a) (3) situation in regard to the dischargee Carter is slightly more complicated. The complication does not stem, however, from any doubt as to the cause of his discharge. Taking into account the now-judicially determined § 8(a) (1) threats by management to get the union ringleader—a status soon identified with Carter—the discharge by plant manager Lucas on Saturday, September 25 for the supposed reason of Carter's failing to report for overtime work that day was more than enough to warrant the conclusion of a pretextual discharge naively masking anti-union motivation.

What and all that complicates it is Carter's status as a temporary employee on the local Atlanta payroll subject to having his employment terminated by the Division Personnel office after receipt and evaluation by it of the usual personnel inquiry composed generally of reports from former employers. Carter was hired on August 25. On Tuesday, September 21, an adverse report, marked "employment disapproved" by the Division Personnel Manager, was received by King, a subordinate to the Division Manager but immediate supervisor of the retreading plant where Carter worked.

Here the action gets packed and it hits from several directions with apparently no pre-planning, design, or complicity, but always against Carter as the single target. For on Saturday morning, September 25, King called the Retread Manager (Lucas) to inform him that. " * * * the Personnel Department has disapproved this employee and it will be necessary for you to discharge him." To this Lucas replied: "Well, I've already discharged him, due to him not reporting to work this morning." Carter was informed of this "termination" on the following Monday morning.

The Trial Examiner, finding first a discriminatory discharge earlier by plant manager Lucas, nonetheless declined to order reinstatement with back pay because of the Personnel directive for a lawful discharge.[1] The Board disagreed and ordered reinstatement with back pay until reinstatement,[2] presumably because

1. The Trial Examiner found that:
"After Lucas determined to fire Carter, Lucas received on the same day a directive from headquarters to let Carter go for other lawful reasons. This establishes that Carter would have been lawfully discharged at that time, and he is therefore not entitled to reinstatement or backpay."

2. The pertinent part of the order read:
"(b) Offer Eugene Carter immediate and full reinstatement to his former or substantially equivalent position, without prejudice to his seniority or other rights or privileges, and make him whole for any loss of earnings he may have suffered by reason of the discrimination against him, by pay-

Carter was not necessarily a corpse with two bullet holes or a "dead duck" [3] so long as there was an opportunity to demonstrate that the adverse inquiry-report was incorrect.[4]

■■ We sustain that part of the Board's conclusion that the same anti-union motivation which earlier produced the "Lucas" discharge denied him the opportunity of overcoming the adverse employment report. But it does not follow, as the Board so readily concluded, that denial of that opportunity is equated with reinstatement as though Carter had successfully persuaded the Employer of the inaccuracy of the report.

An employer is required only to place an unlawfully discharged employee "in the same position—with no more advantages and no fewer advantages—than * * * [he was] in before the discrimination against [him] for union activity." NLRB v. American Steel Bldg. Co., 5 Cir., 1960, 278 F.2d 480, 482. For Carter this means that he must have been afforded a fair opportunity to demonstrate to the appropriate supervisors acting with like fairness that despite the credit-employment-check-report his employment would have been continued and he would have been put on the Akron payroll as a permanent employee. Conversely, the Employer was entitled to demonstrate the opposite to sustain the contention that had there been no "Lucas" discharge Saturday morning, September 25, nevertheless Carter would

---

ment of a sum of money equal to that which he would have earned as wages from the date of the discrimination against him to the date of his reinstatement, less his net earnings during said period, in the manner prescribed in F. W. Woolworth Company, 90 NLRB 289, with interest on the backpay due in accordance with Board policy as set forth in Isis Plumbing & Heating Co., 138 NLRB 716."

3. See the testimony of Lucas:

"Trial Examiner: I understand. Supposing you had not fired him, upon hearing from Mr. King?"

"The Witness: He would have had to have been discharged. Yes."

"Trial Examiner: All right. * * * What you are saying, then, in effect, Mr. Lucas: This corpse had two bullet holes in him; one you put there, and one Mr. King put there, and either one would have killed him. Is that it?"

Donaldson, the Personnel Director, had testified:

"Trial Examiner: You didn't know Carter from Adam, now. Was Carter a 'dead duck' from the minute you stamped that 'disapproved'?"

"The Witness: Yes, sir."

"Trial Examiner: No matter how good he was?"

"The Witness: Unless Mr. King would come back and refute the evidence which was in that credit report, which I don't know of any idea that he would do it. I turn down about 17 percent of them."

"Trial Examiner: Right. Have you ever turned in—Have any of these 17 percent every stayed in the company's employ after you turned them down."

"The Witness: When they come back and prove the information on that sheet is incorrect, which they have, in some cases."

"Trial Examiner: But no matter how good they are, if the information on that sheet is correct, they're finished?"

"The Witness: That's correct."

4. The Board reasoned:

"The disapproval of Carter's personnel report was not tantamount to a discharge. Donaldson * * * testified that some employees have remained in Respondent's employ despite disapprovals on personnel reports. It appears that such employees were given the opportunity to explain the basis for the disapproval and, if they showed that Respondent's information was incorrect, were retained. Carter was given no such opportunity for explanation. He was considered to be a capable worker with a bright future and the indication is that, but for his union activity, he too would have been afforded an opportunity to clarify his alleged difficulties with previous employers. In other words, it does not follow from the mere disapproval of his personnel report that Carter would have been discharged for that reason. All that is certain is that Carter was discharged for his union activity and we believe it would effectuate the policies of the Act to reinstate him with backpay."

have been terminated not later than the following Monday.

The place now for this inquiry is not in the present enforcement proceeding. Rather, this relates to, and is appropriate for, the further administrative proceedings now required to ascertain the amount of lost wages sustained by Carter. NLRB v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 1957, 245 F.2d 594. The expiration date of the back pay award will depend on that fact resolution. See NLRB v. Biscayne T.V. Corp., 5 Cir., 1961, 289 F.2d 338.

Since it might be determined in that proceeding that Carter would indeed have been lawfully discharged so that he would be entitled to reinstatement and back pay only for the brief time span between his unlawful discharge and the time when he would have been lawfully discharged, the Board's order granting back pay for the period from discharge until reinstatement (see note 2 supra) is too broad and must be modified to permit determination of this matter and the entry of an appropriate reinstatement back pay order. See NLRB v. J. H. Rutter-Rex, supra; accord, NLRB v. Trinity Valley Iron & Steel Co., 5 Cir., 1961, 290 F.2d 47; NLRB v. American Steel Bldg. Co., 5 Cir., 1960, 278 F.2d 480.

Enforced in part; modified in part.

J. SKELLY WRIGHT, Circuit Judge (concurring in part and dissenting in part):

I am in full agreement with Chief Judge Brown's excellent opinion except insofar as he would remand this case to the Board to determine whether Carter might have been dismissed for a legal reason subsequent to his discharge for an illegal one. The Board found, and this court accepts its finding, that but for his union activities Carter would have been given the opportunity to explain to the company the factors resulting in his "disapproved" personnel rating. Had he not been fired illegally such a hearing would have been held promptly. Consequently, that he has not been afforded such a hearing is the fault of the company, and the Board, as expressly authorized by the statute, was justified in ordering reinstatement and back pay to the present. It will be soon enough for the company, in the first instance at least, to determine whether it still wants to, and can legally, discharge Carter once it has complied with its obligation to reinstate him.

I would enforce the Board's order in full.