NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

NEUHOFF BROS. PACKERS, INC., Respondent (two cases).

Nos. 24752, 24759.

United States Court of Appeals Fifth Circuit.

July 1, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Lawrence J. Sherman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Atty., N.L.R.B., Washington, D. C., for petitioner.

Fritz L. Lyne, Erich F. Klein, Jr., Lyne, Klein & French, Dallas, Tex., for Neuhoff Bros., Packers, Inc.

David Richards, Dallas, Tex., Sheli Rosenberg, Chicago, Ill., Eugene Cotton, Richard F. Watt, Irving M. King, Cotton, Watt, Jones & King, Chicago, Ill., for intervenor.

Before RIVES, BELL and GOLD-BERG, Circuit Judges.

RIVES, Circuit Judge:

The National Labor Relations Board has petitioned this Court for enforcement of its orders promulgated in two proceedings, here consolidated, against Neuhoff Bros. Packers, Inc. In No. 24759, the Board found that Neuhoff Bros. had violated section 8(a) (3) of the National Labor Relations Act[1] by the discharge of Allen Ray Lewis, and section 8(a) (1) through a speech made by the president of the company. 159 N.L.R.B. 133. No. 24752 involved the Board's determination that Neuhoff Bros. violated sections 8(a) (1) and 8(a) (3) by the discharge of Lloyd Lewis. 162 N.L.R.B. 120.

The questions here presented involve the Board's findings of anti-union motivation behind each of the two discharges and its further finding that the speech threatened Neuhoff Bros.'s employees for participating in union activity and interfered with organizational rights.

Neuhoff Bros. is a Texas corporation engaged in the livestock slaughtering business at Dallas, Texas. It has been involved in various labor disputes since early 1964, when the union[2] began organizational efforts among the Neuhoff employees.[3] An election was held September 22, 1964, which the union lost. The Regional Director set that election aside on January 12, 1965. The union won the second election, held February 18, 1965.

*The Discharge of Allen Ray Lewis*

The suspension and subsequent discharge of Allen Ray Lewis occurred in January and February of 1965, in the period between the two elections. He had been employed by Neuhoff Bros. for nine years, the last seven as tongue dropper at the hog head table in the fancy meat department. During his employment he received three merit salary increases.

The operation of the hog slaughter and production line, insofar as it concerns this discharge, is not complex. After the hogs are killed and dehaired, the carcasses, suspended by the hind

---

1. 29 U.S.C.A. § 151, et seq.

2. United Packinghouse, Food & Allied Workers, AFL–CIO, intervenor in this action.

3. See NLRB v. Neuhoff Bros. Packers, Inc., 5th Cir. 1967, 375 F.2d 372; Neuhoff Bros. Packers, Inc. v. NLRB, 5th Cir. 1966, 362 F.2d 611, cert. denied, 386 U.S. 956, 87 S.Ct. 1027, 18 L.Ed.2d 106.

legs, travel via a movable chain along the production line. Some twenty-five employees work on each carcass before it reaches the fancy meat department. At the viscera table, the head and intestines are separated and placed in a pan. Each pan travels just alongside the carcass from which the contents of the pan were removed. Government inspectors are stationed near the end of the viscera table to inspect the carcass, the intestines, and the head of each hog for possible rejection. Unless rejected, the head slides down an inclined chute to the hog head table, where it encounters, first of all, the tongue dropper. His duties include removing, and shredding the ears, severing the tongue, and trimming the head. From his position the head is passed on the table to employees who, in turn, snoot the head, pull the jawbone, trim the jawbone, and further check the head before it is broken open for removal of brains and glands.

The speed at which the hog carcasses and their component parts, including the heads, pass through the process depends in part upon the number of Government inspectors on the job and in part upon the ability of the company and its employees to handle the material in a sanitary and productive manner. The maximum speed is set by the supervisory veterinary meat inspector and his immediate supervisors. With two Government inspectors on duty since 1965, the maximum speed limit of the chain was 240 carcasses per hour. The supervisory Government inspector testifies that had three inspectors been utilized, they could have passed on as many as 300 carcasses per hour. When too much work accumulated at any one position, the inspectors and, presumably, plant supervisory personnel could stop the movement of the chain. At least one measured speed check, usually more, was made in the course of each working day. The Government inspectors testified that they were able to notice if the speed increased much above the established rate of 240 carcasses an hour.

Occasionally a piling-up of work at various points along the line will necessitate a halt to the movement of the chain. Such stoppages, if excessive in number or in length of time, naturally tend toward inefficient operation of the plant. Since the initial dehairing process passes the hogs through a vat of scalding water, a stoppage in excess of five or six minutes may result in a partial cooking of the hogs caught in the vat during the halt. Counter-measures, such as running cold water into the vat or manually removing the carcasses from the scalding water, may be necessary to avoid the deleterious cooking effect. Thus, in the interest of efficiency of operation and safety of process, the company kept records of all such stoppages lasting in excess of three minutes, with causes noted.

Neuhoff Bros.'s records show that on January 22, 1965, six of seven work stoppages resulted from hog heads piling up in the chute before the viscera table and the hog head table. A company supervisor, Conaway, concluded that Allen Ray Lewis, the tongue dropper, was at fault for not working fast enough. Conaway questioned Lewis as to his efforts and thereafter filed a written reprimand. On the next working day, January 25, Conaway noted two work stoppages due to the same effect and again felt Lewis to be the cause. The General Counsel argues in this proceeding, as it did before the Trial Examiner, that Conaway failed to demonstrate the basis for his conclusion on either day. Conaway testified, in effect, that since the heads were piled up between the viscera table and Lewis's position, the pace of Lewis's work on the heads must have been the cause. Lewis testified that he got behind because the speed of the production line had been increased.

In the early afternoon of the 25th, Conaway escorted Lewis to the office of William Hamzy, secretary-treasurer of Neuhoff Bros. and in charge of personnel problems. Present at the ensuing meeting were Hamzy, Conaway, Lewis, and Henry Neuhoff, III. Unknown to

Lewis, a tape recording of the meeting was made. Hamzy determined to suspend Lewis for one week.[4]

Lewis returned to work on February 3. Conaway entered two notations of chain stoppages due to Lewis's slow pace as tongue dropper. Conaway further wrote up a second reprimand directed at Lewis's performance. He had spoken with Lewis after the first stoppage of that day. Another tape-recorded meeting was held in Hamzy's office. Lewis was discharged. Conaway accompanied Lewis to the locker room and out of the plant gate, as he had at the time of the suspension.

Before the Trial Examiner the General Counsel contended that Neuhoff Bros. had discharged Lewis because of the latter's union activities. Neuhoff Bros. responded that the discharge was occasioned by Lewis's performance, which had resulted in loss of time and production. The General Counsel attempted to show that the production line speed had been increased beyond the established rate and that Conaway had failed to make sufficient investigation for his conclusion that Lewis was not working at the proper level of production. The Trial Examiner concluded that Lewis deliberately had slowed down production. He also concluded that Lewis's discharge was the result of a just cause, citing NLRB v. Soft Water Laundry, Inc., 5th Cir.1965, 346 F.2d 930.

The Board disagreed with the Trial Examiner's recommendation that the 8(a) (3) allegation be dismissed. The Board stated:

"In the instant case we are satisfied that Allen Ray Lewis, absent his union activity, would not have been either laid off or discharged."

The Board's order noted that in its view the record did not support the Trial Examiner's finding that Conaway made his conclusion as to Lewis's culpability after investigation. The Board then accepted the argument of the General Counsel that Conaway merely guessed at the cause, after observation of the condition of the hog head table, without having questioned any of the other employees.

Neuhoff Bros. had installed a hidden camera during the period of Lewis's suspension. The camera was positioned at such a vantage point as would permit photographing activities at Lewis's post on the hog head table. The Board here argues that the movie-making and the tape-recording activities demonstrate a pattern of an effort to get rid of Lewis. Neuhoff Bros. has urged that such precautions were mere prudence, in that they were well aware of Lewis's position and activities within the union effort, and realized they would have to be able to show firm justification for any discharge.

The Examiner viewed the films as strong evidence of Lewis's deliberate slow-down of production. The Board felt that the films were inconclusive and potentially inaccurate, since they were not a constant, uninterrupted record of the day's activity, and since they showed signs of splicing. The Board credited Lewis's explanation of the most lengthy period of his inactivity; the Examiner had declined to credit the testimony of Lewis where it was in conflict with that of other witnesses.

The Board also concluded that even if the employer's asserted justification were to be credited, it did not constitute the moving cause for Lewis's discharge. The Board did not state expressly what it found to be the moving cause.

For a discharge to violate 8(a) (3), both discrimination and a resulting discouragement (or encouragement) of union participation must be shown. American Ship Building Co. v. NLRB, 1965, 380 U.S. 300, 311, 85 S.Ct. 955, 13 L.Ed.2d 855. In fact, "the added element of unlawful intent is also required." NLRB v. Brown, 1965, 380 U.

---

4. Hamzy testified that in the previous Spring of 1964 the right to discipline personnel in this fashion and to discharge was removed from all supervisory personnel except himself. Henry Neuhoff, Jr., and Joe Neuhoff, Sr.

S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839. See Radio Officers Union of Commercial Telegraphers Union, AFL v. N LRB, 1954, 347 U.S. 17, 44, 74 S.Ct. 323, 98 L.Ed. 455. In NLRB v. Great Dane Trailers, Inc., 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1792, after noting that the withdrawal of vacation benefits from strikers, but from no one else, was "discrimination in its simplest form," the Supreme Court said:

"The statutory language [of § 8(a) (3)] 'discrimination * * * to * * * discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an anti-union purpose. American Ship Building Co. v. [National Labor Relations] Board, 380 U.S. 300 [85 S.Ct. 955, 13 L.Ed.2d 855] (1965)."

388 U.S. at 33, 87 S.Ct. at 1797.

■ The discharge of Allen Ray Lewis was not categorically discriminatory, as was the withholding of vacation benefits in *Great Dane Trailers*, supra. See also NLRB v. Fleetwood Trailers, Inc., 1967, 389 U.S. 375, 88 S.Ct. 543, 19 L. Ed.2d 614. There is no finding in the record before us that the discharge of Allen Ray Lewis was discriminatory. Without a precise finding as to discrimination, we turn to the whole record to see whether the evidence supports the inference of discrimination which the Board must have drawn to find a violation of 8(a) (3). Initially we note that the Board argues here that Neuhoff Bros. has discharged no one else for such reasons. There is no indication in the record, however, that any other employee had performed in the manner attributed to Allen Ray Lewis. "Discrimination consists in treating like cases differently." Frosty Morn Meats, Inc. v. NLRB, 5th Cir.1961, 296 F.2d 617, 621.

■ Although unlawful intent is recognized as a separate element of proof in establishing a violation of 8(a) (3), NLRB v. Brown, supra, it is a factor also relevant to the matter of discrimination. Frosty Morn Meats, Inc. v.

NLRB, supra, 296 F.2d at 621. Of course the question of motivation is of paramount importance to the inquiry of whether there was "discrimination * * to * * * discourage," American Ship Building Co. v. NLRB, supra; Radio Officers' Union of Commercial Telegraphers Union, AFL v. NLRB, supra. Thus a finding of unlawful motivation may dispose of a case where the Board reasons from the existence of that motive, and from other relevant factors, that a discharge was discriminatory and that it discouraged protected activity. In the case *sub judice*, the Board made its assessment of the motive and concluded that absent his union activity, Lewis would not have been discharged.

There are flaws in the Board's consideration and evaluation of motivation in this case. We review briefly this Court's views on the subject.

"To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based; indeed, a discriminatory act on the part of the employer is not in itself unlawful unless intended to prejudice an employee's position because of his union activity, i.e., some element of antiunion animus is necessary. See Radio Officers' Union, etc. v. NLRB, 1954, 347 U.S. 17, 42–44, 74 S.Ct. 323, 337, 98 L.Ed. 455, 478–479. Thus, in controversies involving employee discharges, the motive of the employer is the controlling factor, NLRB v. Brown, supra, 380 U.S. at 287, 85 S.Ct. at 985–986, 13 L.Ed.2d at 846, and, absent a showing of antiunion motivation, an employer may discharge an employee for a good reason, a bad reason, or for no reason at all. NLRB v. I.V. Sutphin Co.-Atlanta, Inc., 5 Cir.1967, 373 F.2d 890; NLRB v. Longhorn Transfer Serv., Inc., 5 Cir.1965, 346 F.2d 1003, 1006. If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. NLRB

v. Soft Water Laundry, Inc., 5 Cir. 1965, 346 F.2d 930, 934."

NLRB v. O. A. Fuller Super Mkts., Inc., 5th Cir., 1967, 374 F.2d 197, 200.

"If in the absence of a discriminating motive the employee would not have been fired, his discharge deprives him of a right he otherwise would have had to continue his job while participating in union activities. Such discharges make other employees apprehensive that if they join a union they endanger their jobs. The inquiry must be made even where the discharged employee has done something that might warrant his discharge, since if it is something that his employer might pass over in another instance the firing of the union employee can be discriminatory. If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part. The employee will not have been harmed by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. It must be remembered that the statute prohibits discrimination, and that the focus on dominant motivation is only a test to reveal whether discrimination has occurred. Discrimination consists in treating like cases differently. If an employer fires a union sympathizer or organizer, a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently."

Frosty Morn Meats, Inc. v. NLRB, 5th Cir.1961, 296 F.2d 617, 621.

The substantial evidence standard is not changed merely because the Board and the Trial Eraminer have disagreed. Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456. See also NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 407–408, 82 S. Ct. 853, 7 L.Ed.2d 829. However,

"evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion."

340 U.S. at 496, 71 S.Ct. at 469.

■ The record considered as a whole, in the case at bar, will not support the Board's failure to accept the truth of the business justification offered by Neuhoff Bros. for their discharge of Allen Ray Lewis. The Board's adoption of the Examiner's credibility findings supports our conclusion. Clearly there existed at least some justification for the discharge of the tongue dropper who slowed down production.

■ The employer does not escape on that point, however, in light of the Board's further conclusion that, even if the employer's asserted justification were accepted at face value, such justification did not represent the moving cause for the discharge. "Here, as in almost all of these cases, there is clear evidence of the employer's animus against unions and clear evidence of good cause for the employee's discharge." Frosty Morn Meats, Inc. v. NLRB, supra, 296 F.2d at 618. Although the Supreme Court has spoken in terms of the employer acting "purely," American Ship Building Co. v. NLRB, supra, 380 U.S. at 311, 85 S.Ct. 955, it has more often said that "the real motive" must be ascertained. NLRB v. Brown, supra, 380 U.S. at 287, 85 S.Ct. 980, and cases there cited. In this regard, this Court has spoken in terms of "motivated substantially," NLRB v. Camco, Inc., 5th Cir. 1966, 369 F.2d 125, 126; "the motive," NLRB v. I.V. Sutphin, Co.-Atlanta, Inc., 5th Cir.1967, 373 F.2d 890, 893; "the moving cause," Frosty Morn Meats, Inc. v. NLRB, supra, 296 F.2d at 621; and "primarily motivated" and "actually motivated," NLRB v. Atlanta Coca-Cola

Bottling Co., 5th Cir.1961, 293 F.2d 300, 309, 310. We have also said that, "to have a perfectly good motive genuinely followed is not enough if, on the facts, the motivation was twofold, with one being a purpose to eliminate the Union." NLRB v. American Mfg. Co., 5th Cir. 1965, 351 F.2d 74, 79. Bearing in mind Mr. Justice Frankfurter's warning against attempts at new phraseology, see Universal Camera Corp. v. NLRB, supra, 340 U.S. at 489, 71 S.Ct. 456, we, nevertheless, synthesize these varying expressions: to constitute an 8(a) (3) violation, an improper motive must be a cause without which the employee would not have been discharged.

■■ Our study of the record convinces us that the record as a whole will not support the Board's conclusion that the moving cause of Allen Ray Lewis's discharge was not the asserted justification. We realize, of course, that the Board's choice between fairly competing inferences will be honored, even though we might draw a contrary inference on a consideration of the case de novo. Universal Camera Corp. v. NLRB, supra, 340 U.S. at 488, 71 S.Ct. 456; NLRB v. Universal Packing & Gasket Co., 5th Cir.1967, 379 F.2d 269; NLRB v. O. A. Fuller Super Mkts, Inc., supra, 374 F.2d at 200. Nevertheless, where there is insubstantial support in the record for the Board's inference as to whether the antiunion animus was a part of the motive for the discharge, we may accord respect for a contrary inference, particularly where, as here, such contrary inference was drawn by the Trial Examiner. See Boaz Spinning Co. v. NLRB, 5th Cir.1968, 395 F.2d 512; NLRB v. Coats & Clark, 5th Cir.1956, 231 F.2d 567, 572.

■ We also note that the Board's conclusion misplaces the risk of nonpersuasion as to motive on the employer, by finding that the justification offered by Neuhoff Bros. "was not the moving cause" for the discharge. Once the employer has come forward with evidence to establish the existence of a legitimate motive for discharge, the burden of proving that an improper motivation contributed to that discharge lies upon the General Counsel. NLRB v. Great Dane Trailers, Inc., supra, 388 U.S. at 34, 87 S.Ct. 1792; Avondale Shipyards, Inc. v. NLRB, 5th Cir. 1968, 391 F.2d 203; NLRB v. I. V. Sutphin, Co.-Atlanta, Inc., supra, 373 F.2d at 893.

For all of these reasons, and for each of them, we must deny enforcement of the Board's order in No. 24759 to the extent that it held Allen Ray Lewis's discharge to be a violation of section 8(a) (3).

*The Speech of Henry Neuhoff, Jr.*

The 8(a) (1) charge in No. 24759[5] centered on a speech made by the company president at a company Christmas dinner, December 13, 1964, which included such passages as the following:

"Now, anyone—I am going to say this frankly—anyone who feels that he cannot work as a part of this family and of this Neuhoff team had better find some place else to go, because we cannot use him around here. * * *

"They do not need any new election, but let's get down to real facts. That these people who are so unhappy with us; feel that they are being mistreated so badly—why do they continue to work for us? I believe that if I thought the company that I was working for was not paying me enough, I would go someplace else. Does this make sense to you? If you believe that this does make sense, then you had better take it on yourself to encourage these people to get out, because the sooner they do, the better it will be for all of us * * *

"Now, there is one other thing that I think I should mention. I think this would be the time. I understand that some of you have been discontented

5. Other 8(a) (1) allegations, passed on by the Trial Examiner, but not by the Board, are not before this Court. See

n. 1 to the Board's decision and order, 159 N.L.R.B. 133.

because we are requiring each of you to sign a slip when you come in late. You might as well know that this is a direct result of union activity. They have continuously accused us of treating some people better than others. I think you have to admit that—most of you—we have always tried to be fair with everyone and we will continue to do so in the future. This rule, which some of you do not like, was put in effect to make sure that everyone was treated the same. If you think this is bad, if you think the rules that are coming in the plant—there are rules coming in the plant, this is only the beginning. I hope you will never have occasion to find out how rough it can be."

We quote from the analysis of the Trial Examiner:

"My analysis of the speech, is that there is at most a single technical violation of Section 8(a) (1) of the Act. It is obvious that Neuhoff is endeavoring to heal wounds and to smooth over any friction between employees that may have developed during the Union's organizing campaign. He talks to the discord among the employees and the fact that some wanted someone else to represent them and be their representative in promoting their rights with the Company, but in that respect the Respondent acknowledged 'this they have a right to do and we respect this right.' This is an acknowledgement of safety to employees of the Respondent with no threat that anything would happen to them if they exercise this right of theirs or with no promise of benefit if they ignored or if they refused to engage in this type of activity. The point that I believe is a technical violation of Section 8(a) (1) is when Neuhoff stated that the new requirement to sign a slip when an employee came in late was the direct result of 'union activity.' But then he went on to say that in the Respondent's effort to be fair with everyone and the fact that they were going to continue to be fair in the future 'this rule, which some of you do not like, was put in effect to make sure that everyone was treated the same.' His remarks thereafter that there would be rules coming into the plant, would relate as well to the result of bargaining between the collective-bargaining representative as it would be to the thought that the rules would be unilaterally established by Respondent. There is no 'retaliation' implied by Respondent to union activities of its employees. His closing remarks is [sic] a simple appeal to the employees not to be misinformed or mislead plus a statement that the Respondent has no grudge against anyone because of his union activity. Keeping this in mind, as well as the fact that this speech was given at a Christmas party where good will is the theme, I do not believe the record warrants a finding that Respondent was interfering with, coercing or restraining employees with respect to their rights under the Act."

The Board disagreed with that evaluation, and found that the statement was to the effect that the advent of stringent rules was due not to the promotion of orderly and efficient operation of the plant but to the protected activities of some of the employees. The Board also found an exhortation to employees to pressure their union-adhering colleagues to "get out."

 We believe that the Board has made its choice among fairly competing interpretations of the speech. Our consideration of the whole record leads us to find substantial evidence to support the Board's finding of a violation of 8(a) (1) in Henry Neuhoff, Jr.'s speech. We grant enforcement of that portion of the Board's order in No. 24759 to the extent that such order applies to that 8(a) (1) violation.

### The Discharge of Lloyd Lewis

On April 27, 1966, Lloyd Lewis, a brother of Allen Ray Lewis, was discharged by Neuhoff Bros., after nearly

six years of employment. Following the conclusion of the Trial Examiner that Lloyd Lewis was discharged because of his union activities, the Board found a violation of sections 8(a) (3) and 8(a) (1) and ordered reinstatement and payment for lost wages.

Lloyd Lewis was on an overtime crew in the curing department on April 25. That evening, during a break, the night superintendent of the plant, Jack Hynes, encountered Lewis exiting from the "bacon room." According to Lewis's testimony, he had stepped into the room to look at a clock. He claimed before the Trial Examiner that Hynes asked if he was sure he had not stepped in to get some meat and that he, Lewis, had denied that as the reason. Hynes testified that Lewis had emerged from the "bacon room" with a "wad of lunch meat in his hand," stating, "I am hungry." According to Hynes, he told Lewis to put the meat back "or else you will get in trouble," and that Lewis did so. Hynes did not know Lewis's name at the time. Moore, another employee, testified that he had been with Lewis during the break, and that Lewis had told him that he, Lewis, wanted to step into the next room to check on the time. Moore stated that Lewis rejoined him shortly and told him of the encounter with Hynes, but did not mention having been accused of taking luncheon meat. According to Moore, Lewis had no luncheon meat with him after the encounter. The existence of a clock in the "bacon room" was established, as was the lack of a clock in the area in which Lewis and Moore had been working.

Hynes explained the company policy which had prevented his reporting any such incident to the foreman after hours. He testified that when he reported to work the next afternoon, sometime around 3:30 P.M., he sought out Lewis's foreman, Henry Esser. Although Hynes had not recognized Lewis, he claimed he had deduced that Lewis worked on Esser's crew because of the hour, the manner in which Lewis was dressed, and the direction in which Lewis headed after the encounter. Esser testified that Hynes told him he had caught one of his men coming out of the bacon room with luncheon meat the evening before, but that he did not know the man's name. On looking around, according to Esser, Hynes identified Lewis by sight, and they called him over. Esser stated that he told Lewis of having heard of Lewis's taking some luncheon meat, and that Lewis responded, "I only had three pieces." Lewis testified, "I told him I didn't have any meat." Esser and Hynes escorted Lewis to Hynes's office. Lewis remained outside. Hynes departed, and Esser and Lewis went to the office of Leonard Hamzy, previously identified herein as a company officer having responsibility for matters of personnel. Lewis waited a few minutes in the lobby while Esser went in, then was called into Hamzy's office where he found Hamzy, Esser and Hynes. Unknown to Lewis, a tape recording was made of the interview which ensued.[6] In the course of the interview Lewis consistently admitted he had been inside the bacon room, but, in response to questions as to whether he had walked out with any luncheon meat, said he did not "steal any meat." When asked what he had had in his hand, he responded, "I have nothing to say."

In the proceedings before this Court, Neuhoff Bros. argues that Lewis's style of response is technically truthful since, by Hynes's account, the allegedly purloined meat was returned to the "bacon room." The employer points out that Lewis never denied having had any meat in his hand.

Hamzy instructed Lewis to report to him the next morning before starting work. Lewis did so, accompanied by Esser, his foreman. According to Lewis, Hamzy indicated he could not condone the taking of luncheon meat and said he

---

6. The parties stipulated that the recording was an accurate reflection of the interview, and the Trial Examiner so found.

would have to let Lewis go. The two reasons assigned for the discharge were stealing of luncheon meat and unauthorized presence in a department other than that in which the employee worked.

The Trial Examiner noted that Lloyd Lewis admitted to an infraction of the rule regarding unauthorized areas.[7] Passing the question whether Lewis had in fact taken the luncheon meat, the Examiner found "that Respondent seized upon Lewis' insignificant derelictions to rid itself of a most active union supporter." Further, "I am convinced that Lewis was discharged because of his union activities and accordingly that Respondent thereby violated Section 8(a) (3) and (1) of the Act." The Board adopted the findings and conclusions of the Trial Examiner.

We consider first the dominating question of motivation for the discharge, because it is that factor on which the Trial Examiner and the Board expressly rely. Respondent has made some effort to indicate that it had no knowledge of Lloyd Lewis's union activities. The Examiner's conclusion that Neuhoff Bros. did in fact know of such activities is supported by Hamzy's testimony that, a year prior to the discharge, he received notification of Lewis's selection as a shop steward.

The Examiner made the following analysis of the night supervisor's behavior:

"Although Hynes testified that he caught Lewis at 6:10 or 6:15 in the evening, he testified that he did not know Lewis and that although he worked at least until 11 o'clock that night and Lewis worked until 7 or 7:30, he made no attempt to find out who Lewis was. It would appear normal that if he had deemed Lewis' infraction to be a major one he would have asked him his name. Failing that, it appears improbable that he would have waited until the next night to identify the culprit, when he very easily at any time could have gone down to the curing room where he knew Lewis must be working and identified him there. His testimony that he filed [sic] out a reprimand slip with regard to the infraction without signing it and without putting Lewis' name on it, and then, the next night, signed and put Lewis' name on it does not ring true.

"It is my considered opinion that Hynes gave no further thought to the incident until he happened to mention it to Foreman Esser, the following night. When Esser identified the culprit as Lewis, the shop steward, the incident immediately took on proportions that Hynes had not theretofore considered."

 We customarily accord deep respect for credibility determinations made by the Trial Examiner and the Board, and we do so here. See NLRB v. Plymouth Cordage Co., 5th Cir.1967, 381 F.2d 710, 711; Martin Sprocket & Gear Co. v. NLRB, 5th Cir.1964, 329 F.2d 417, 420. The inference of improper motivation for the discharge is a reasonable one, supported by the record. Cf. Boaz Spinning Co. v. NLRB, supra; NLRB v. Coats & Clark, supra. The choice of the inference that such motivation contributed to the discharge is at least fairly competing with the inference that it did not, and we will not disturb that choice. Universal Camera Corp. v. NLRB, supra.

Implicit in the Examiner's findings is the supportable conclusion that the improperly motivated discharge of an active union adherent, such as Lewis, would have a discouraging effect on membership in the union. Such an effect is almost presumptive in these cases. See, e.g., Frosty Morn Meats, Inc. v. NLRB, supra, 296 F.2d at 621.

The question of discrimination remains. The Examiner proceeded on the

---

7. There was controverted evidence that Lewis had been reprimanded twice previously for infraction of the same rule. The Trial Examiner assumed that such reprimands had taken place, and proceeded to the matter of motivation.

assumption that Lewis was guilty of both infractions for which the discharge purportedly was made. The Examiner reasoned as follows:

"There is no question that Lewis was guilty of being in the wrong department. This he admits and gives a perfectly rational explanation. And it is clear that this is a common, in fact daily, infraction at the Respondent's plant. Yet Hamzy, the only representative of the employer authorized to effect a discharge, testified that he could recall no incident of a man having been discharged for being in the wrong department. Hamzy also testified that he has never fired a man for eating luncheon meat on the job and was able to think of only two occasions when he had discharged employees for converting the company's product. On one of these occasions an employee was caught taking about 80 pounds of meat 'over the fence' and on the other, an employee was packing a box with sausage and a beef tongue and, upon being challenged, announced that he did not trust the shipping department and he would make up his own order, whereupon he was discharged. Hamzy testified that employees have been discharged for cooking meat in the knife sterilizing box or in the lard cooking tank but he was apparently unable to give any instance where an infraction of the type with which Lewis was charged resulted in a discharge."

A required inference of discrimination from those circumstances is more than reasonable. It is supportable in the record, although not drawn specifically by the Examiner. Since the Examiner and the Board concluded that a violation of 8(a) (3) had been made out, and since discrimination is a necessary element of such a violation, we must assume that an inference of discrimination was made, although not set forth in specific terms by the Examiner.

The Board's finding of a violation of 8(a) (3) in the discharge of Lloyd Lewis is supported by the record. The find-ing of a violation of 8(a) (1) is thereby also supported. See NLRB v. I. V. Sutphin Co.-Atlanta, Inc., supra, 373 F.2d at 894. We therefore grant enforcement of the Board's order in No. 24752. As heretofore indicated, we also grant enforcement of the Board's order in No. 24759 to the extent that it applies to the 8(a) (1) violation in the speech of Henry Neuhoff, Jr., but deny enforcement of the other parts of the Board's order in No. 24759.

Enforcement granted in part and denied in part.