The BERRY SCHOOLS, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

N. Gordon CARPER, Joyce Carper, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 78–1594, 78–1766.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1980.

**694**

Fisher & Phillips, Atlanta, Ga., for petitioner cross-respondent in No. 78–1594.

Robert W. Ashmore, R. Mason Barge, Atlanta, Ga., for Berry Schools.

Bronson, Woolf & Corn, Charles T. Corn, O. Frank Woolf, Atlanta, Ga., for petitioners in No. 78–1766.

Elliott Moore, Deputy Assoc. Gen. Counsel, Howard E. Perlstein, Sandra S. Elligers, N.L.R.B., Washington, D.C., Attys., for respondent N.L.R.B.

Robert W. Ashmore, R. Mason Barge, Atlanta, Ga., for intervenor.

Before COLEMAN, Chief Judge, BROWN and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

These two consolidated cases involve unfair labor practices allegedly committed by the Berry Schools in reaction to its college faculty's initial steps toward unionization. After engaging in this activity, Dr. Gordon Carper was demoted from his position as chairman of the Department of Social Sciences, and Dr. Joyce Jackson was not promoted to full professor, a position for which she was eligible at that time.

Both faculty members filed unfair labor practice charges against the school. After a hearing, and decision by an ALJ the Board (NLRB) dismissed Carper's complaint, reasoning that in his position as department chairman, Carper had exercised supervisory powers and therefore was unprotected by the National Labor Relations Act (the Act). The NLRB affirmed the findings and conclusions of the ALJ in Berry Schools, Inc., 234 N.L.R.B. 942 (1978). We enforce this portion of the Board's order.

The ALJ also found that the college's failure to promote Dr. Jackson to full professor was an unfair labor practice, done in retaliation for her attempts to engage in protected concerted activity. The ALJ ordered that she be promoted to full professor and made whole for her lost earnings. These findings and conclusions were also affirmed by the Board,[1] but we reverse.

---

1. The Board modified the ALJ's remedy so that back pay was computed in accordance with F. W. Woolworth Company, 90 N.L.R.B. 289 (1959), and so that interest was computed in the manner prescribed in Florida Steel Corporation, 231 N.L.R.B. 651 (1977).

## I. Factual Background

The Berry Schools comprise the Berry Academy, a preparatory school, and Berry College, offering bachelor and master degrees in the liberal arts. In the spring of 1975, Berry College, finding itself in severe financial straits, was having difficulty in sustaining even its then existing levels of pay to its faculty. In a letter of March 5, President John Bertrand announced that he would recommend to the Board of Trustees only "a modest uniformly applied pay increase in addition to limited adjustments for reason indicated in the budget guidelines."

Salaries were already quite low. In fact, one estimate was that they were 22% "behind" where they had been five years before. For four of the previous five years, an average cost of living increase of 4% to 5% had been given. In one of those years there had been no increase at all. Thus, the faculty was in as desperate a financial position as the college.

On March 12, Dr. Jackson, the elected chairman of the Berry College faculty council, called an informal meeting for "concerned faculty" members. Forty members met and elected Dr. Jackson to chair the meeting. She appointed an ad hoc committee, chaired by Dr. Carper, to research the possible advantages of collective bargaining for the faculty. On March 13, she wrote a letter to President Bertrand, informing him of all that had transpired, including "a unanimous mandate to consider the merits of the Berry College faculty's constituting itself as a self–organized collective bargaining agent through election processes prescribed by the National Labor Relations Board."

On March 25, President Bertrand called a meeting of the entire faculty and read a long speech explaining why he believed collective bargaining was out of place on the campus of a small private institution with limited endowments and tuition income. He made references to a "small power bloc deliberately maneuvering . . . to seek control [over] the larger number" of the faculty and asked the rhetorical question:

Do you really feel like saying, "Sock it to the students by raising tuition drastically, but let's get ours." "Bleed the endowment for cash if you have to, but let's get ours." "Destroy the sense of community shared here by faculty staff and students if you have to, but let's get ours." "Misinterpret what key administrators are saying without having the decency to even check for accuracy if you have to but let's get ours."

The President also stated that he was meeting that afternoon with the executive committee of the Board of Trustees to discuss salaries, tenure, promotion recommendations, and changes in such administrative assignments as departmental chairmanships. Dr. Jackson then responded on behalf of the faculty to President Bertrand's speech.

Bertrand repeated the speech the next day at a meeting of the college staff (including secretaries, maintenance personnel and security guards), the faculty and staff of the affiliated academy, and student leaders. Again, Dr. Jackson responded.

A meeting of the Board of Trustees personnel relations committee was held on April 4. Dr. Jackson, Dr. Carper and about fifty–eight other members of the faculty, staff and student body attended. The status of faculty salaries and "viable alternatives to collective bargaining" were discussed.

On April 15, at a meeting of all the faculty and staff of both the college and the academy, President Bertrand made several announcements, including that Dr. Carper's position as chairman of the Social Science department would be filled by another professor. Bertrand also named all faculty members who were to be promoted. Dr. Jackson's name, which had been submitted for consideration of promotion to full professorship, was not on the list. Finally, Bertrand reported an 8% salary increase (plus 2% in selected pay adjustments), an amount unprecedented in the preceding five years.

A public announcement of the replacement of a department chairman was also unprecedented at Berry College. When asked why he made this announcement publicly, Bertrand testified, "I felt that many of the matters that were discussed . . including this particular change, was of concern and rightful interest to the entire faculty and staff of the Berry Schools." Dr. Carper was not informed of the replacement decision until five minutes before the announcement.

In the speech which incorporated these announcements Bertrand stated that "leadership . . . [as a college president] demands . . . toughness." He made references to "labor–management psychology" which "hamper[ed] effective functioning of both parties" and to "faculty activism" resulting "in disruptive tactics which are in complete violation of the whole purpose of higher education."

## II. Dr. Carper's Claim

The ALJ found that the public announcement of Dr. Carper's removal from the chairmanship of his department "was an apparent public rebuke to the chairman of the ad hoc committee considering collective bargaining for the faculty." Notwithstanding this, and declining to specifically rule on whether he had engaged in protected concerted activity, the ALJ dismissed Carper's

charges against his employer, finding that in his position as department chairman he had exercised supervisory authority and therefore was not protected by the Act. The correctness of this ruling is the primary issue which concerns us on Carper's appeal.

Section 7 of the Act, 29 U.S.C.A. § 157 (West 1973), defines the types of concerted activity employees may engage in.[2] Under § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1) (West 1973),[3] it is an unfair labor practice for an employer to interfere with the exercise of § 7 rights by his employees. However, this protection is afforded only to employees, as defined in 29 U.S. C.A. § 152(3)[4] and not to supervisors. *Beasley v. Food Fair, Inc.*, 416 U.S. 653, 654–55, 94 S.Ct. 2023, 2028, 40 L.Ed.2d 443, 446–47 (1974); *NLRB v. Big Three Welding Equipment Co.*, 359 F.2d 77, 80 (5th Cir. 1966).

The term "supervisor" is defined in 29 U.S.C.A. § 152(11) as:

. . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

2. 29 U.S.C.A. § 157 states:
   Employees shall have the right to self–organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

3. 29 U.S.C.A. § 158(a)(1) states:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . ..

4. 29 U.S.C.A. § 152(3) provides:

The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

The factors which indicate supervisory authority are listed disjunctively. Therefore, in order for supervisory status to exist, the authority to perform at least one, but not necessarily all of the enumerated functions, is necessary. A legion of cases so hold. E.g., *NLRB v. Gray Line Tours, Inc.*, 461 F.2d 763, 764 (9th Cir. 1972); *Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1131 (5th Cir. 1971); *Federal Compress & Warehouse Co. v. NLRB*, 398 F.2d 631, 634 (6th Cir. 1968).˙ Of course, the power to perform one or more of these functions must require the use of independent judgment and not be merely clerical in nature. *Sweeney, supra*, 437 F.2d at 1131.

■ As the Act states, a person is a supervisor even if he does not have complete authority to perform any of these functions but can "effectively recommend" the performance of one or more. The effectiveness of an alleged supervisor's authority is normally a question of fact. *Stop & Shop Companies, Inc., Medi Mart Division v. NLRB*, 548 F.2d 17, 19 (1st Cir. 1977). The ALJ in this case found that "department chairmen have and exercise the authority, in the interest of Berry, effectively to recommend the hire, retention and discharge of members of their department, and they are therefore supervisors within the meaning of the Act."

■ Our review is limited to a determination of whether there was substantial evidence in the record to support the Board's finding. *Sweeney, supra*, 437 F.2d at 1131. A determination by the NLRB that an individual is not covered by the Act will stand if there is a reasonable basis in the record and in the statute to support this conclusion. *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304, 97 S.Ct. 576, 580–81, 50 L.Ed.2d 494, 500–01 (1977); *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130–31, 64 S.Ct. 851, 861, 88 L.Ed. 1170, 1184–85 (1943).

Dr. Carper is the chairman of one of sixteen departments in the Berry College. Department chairmen at Berry are appointed to their positions by President Bertrand and serve at his pleasure. Although a department chairman is not given extra compensation for his position, his teaching load is reduced in order to allow him to perform his additional duties.

■ Dr. Carper and other department chairmen testified that the departments are run democratically, on a collegial basis. In fact, a few years before the incident at issue here, the title had been changed from department "head" to department "chairman," supposedly to suggest more clearly the collegial nature of each department's operations. However, no changes in the authority and responsibilities inherent in the position were made. It is the worker's actual powers and duties, and not his title, which controls. *Phillips v. Kennedy*, 542 F.2d 52, 55 (8th Cir. 1976); *NLRB v. Sayers Printing Co.*, 453 F.2d 810, 815 (8th Cir. 1971); *NLRB v. Fullerton Publishing Co.*, 283 F.2d 545, 550 (9th Cir. 1960). Furthermore, the method of appointing department chairmen was not revised in favor of a more democratic election by the faculty.

At department meetings, all faculty members participate in discussion and development of recommendations to the president and other decisionmakers in the college hierarchy concerning such matters as the creation of new positions, recruiting and hiring of persons to fill old or new positions, departmental budgeting of funds and curriculum scheduling. While a department chairman may accept these recommendations of other faculty members, he is also free to modify these recommendations or to make his own to the president.

There was also evidence of incidents where Carper and other department chairmen had made their own recommendations concerning hiring. Dr. Bertrand testified that, although it happened rarely, he had always taken the recommendations of department chairmen to terminate members of their departments. Moreover, the record refers to a few incidents of personnel problems with particular faculty members in Dr. Carper's department. In these cases, Dr. Carper alone in his department worked closely with President Bertrand and Academic Dean Moran in determining whether

these faculty members should be fired or retained. More often than not, Dr. Carper's recommendations to his superiors were in these instances followed.

Dr. Carper had exclusive authority within his department to evaluate the performance of its faculty members and to recommend merit salary increases. Although some of these recommendations were not taken, many others were. President Bertrand testified that he gave the recommendations of department chairmen "top weight" in making his final decisions on merit increases unless he felt that he had some relevant information that the department chairman did not have. Moreover, our review of the record gives us the impression that in many instances in 1974 and 1975, Dr. Carper's recommendations for merit increases were not taken by the president simply because of the college's obvious lack of funds. The president's failures to heed Dr. Carper's advice in these instances are, therefore, very little indication of his lack of supervisory authority.

Our review of the NLRB decisions on this issue reveals that the Board finds the existence of supervisory status among university department chairmen in approximately half of the decisions. It all depends on the facts.

In general, we find that in those cases where the Board found no supervisory status to exist, there was a truly collegial system of department operation. Often the chairman did little more than preside over the department faculty meeting and relay the department's general concensus to the ultimate decisionmakers. Fordham University, 214 NLRB 971 (1974); University of Miami, 213 NLRB 634 (1974); Florida Southern College, 196 NLRB 888 (1972); University of Detroit, 193 NLRB 566 (1971); Fordham University, 193 NLRB 134 (1971). Trustees of Boston University v. NLRB, 575 F.2d 301 (1st Cir.1978), on which Dr. Carper relies heavily, also is distinguishable on this basis. In that case, the department chairmen never made recommendations to the president and Board of Trustees of the university unless he had consulted with all full professors with tenure in his department.

The terms of service of nonsupervisory chairmen tend to be not entirely dependent on the discretion of the college president. They may serve on a rotating basis, Florida Southern College, supra or be appointed by the president after consultation with that department's faculty. Boston University, supra; Rosary Hill College, 202 NLRB No. 165 (1973).

Most importantly, these chairmen do not have the power to recommend effectively. Usually, their vote on matters such as hiring, firing, promotion and tenure, carries as much weight as that of any other department faculty member. Fordham University (1974), supra; Florida Southern College, supra; Fordham University (1971), supra. In one case the department chairman's vote weighed less than the recommendation of the rest of the faculty. University of Miami, supra.

On the other hand, the cases in which the NLRB concluded that department chairmen held supervisory authority consistently relied on the fact that these individuals could effectively recommend important department policy. New York University, 221 NLRB 1148 (1975); Rensselaer Polytechnic Institute, 218 NLRB 1435 (1975); Point Park College, 209 NLRB 1064 (1974); Syracuse University, 204 NLRB 641 (1973); Adelphi University, 195 NLRB 639 (1972); C. W. Post Center, 189 NLRB 904 (1971).[5]

■ We find no merit to Dr. Carper's contention that NLRB v. Talledega Cotton Factory, 213 F.2d 209 (5th Cir. 1954), makes his demotion from supervisory status an unfair labor practice because it put rank and file employees in fear of losing their job and thereby restrained them from exercising their § 7 rights. Oil City Brass Works v. NLRB, 357 F.2d 466, 470 (5th Cir. 1966), held that whether rank and file employees are put in fear by a supervisor's discharge is irrelevant. "If the fear instilled in rank–and–file employees were used in

---

5. We intimate nothing, but say that all college/university cases must be reread now in the light of NLRB v. Yeshiva University, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).

order to erect a violation of the Act, then any time a supervisor was discharged for doing an act that a rank–and–file employee may do with impunity the Board could require reinstatement." *Id.* In both cases this Court held that discharge of supervisors was an unfair labor practice only because these supervisors refused to obey their employers' orders to commit unfair labor practices. We enforced the Board's orders reinstating these supervisors because the orders were not meant to penalize the employers for discharging the supervisors, but only to remedy the harm that had been done to the rank and file employees by trying to force the supervisors to commit unfair labor practices.

◼ In light of our limited power to review the Board's findings and conclusions, we believe that the record amply demonstrates substantial evidence to support the Board's finding that Carper was a supervisor unprotected by the Act and we enforce the Board's order.[6]

◼ Finally, we address the issue of the transfer of Mrs. Carper out of the Social Science Department. Dr. Carper's wife had been a secretary in his department until he was demoted. At that time she was transferred to another department. She too filed charges against the college. But we agree with the Board that since Mrs. Carper's claims were entirely derivative of those of her husband, the Board's dismissal of her charges against the college was proper also. Mrs. Carper contends on appeal that her claims were not derivative since

she too attended the May 5 "concerned forty" faculty meeting. However, the subject of this meeting was possible collective bargaining for faculty members, and not for college staff. Moreover, she was transferred to another secretarial job within the college at which she worked essentially the same hours and was actually paid more. We fail to see how this can be considered a reprisal by the college which understandably wanted to put Mrs. Carper to work in a department other than the one in which her husband had been recently demoted.

### III. Dr. Jackson's Claim

In March of 1975 Dr. Joyce Jackson had been with the Education and Psychology Department of Berry College for six academic years. The general college policy, as stated in its handbook, required a faculty member to "remain three years in a given rank before becoming eligible for promotion."[7] Due to her "outstanding performance," President Bertrand had promoted Dr. Jackson from assistant to associate professor in March of 1971, after only two years in the former position.

Thus, she was eligible for promotion from associate to full professor three years later, in March of 1974. However, she declined to seek promotion that year, feeling that she needed more time to make the necessary transition from associate to full professor.

In May of that year, Dr. Jackson was chairman of the Faculty Relations Committee. In that capacity she made a report to

---

6. We point out that even if Dr. Carper's contention that the college departments were run on an entirely collegial basis were accepted, he still might not be protected by the Act. In the recent decision in *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), the Supreme Court held that in a college truly run on a collegial basis, all faculty members are managerial employees as defined in *NLRB v. Bell Aerospace Company*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), to whom the Act's protection is not afforded.

7. The procedure for promoting faculty is as follows: At the beginning of each academic year the faculty promotion and tenure committee informs each faculty member of his eligibility for promotion. An eligible faculty member

who requests consideration submits annual reports and other information to the committee bearing on his candidacy. The candidate's department chairman makes a written evaluation of the candidate and submits it to the committee. The committee assesses each candidate and forwards its recommendations to the academic dean. If the dean concurs with the recommendation, it is submitted to President Bertrand. If the dean and the committee disagree, the recommendation is reconsidered. If a consensus is reached, that recommendation is forwarded to Bertrand; if no consensus is reached, both recommendations are forwarded to President Bertrand who makes the final ruling.

the Faculty Council at its May 28, 1974, meeting concerning the economic problems of the faculty due to the combined effects of inflation and the low rate of pay at Berry College.[8] The Council unanimously voted to forward this report to President Bertrand. In June, the Faculty Council also requested that President Bertrand release a report on the range of salaries at Berry College. Dr. Jackson testified that President Bertrand "was very upset" after these requests were made, and that they got into a "heated discussion" about them.

On June 23, 1974, Bertrand invited Jackson, who was by then Chairman–elect of the Faculty Council, to present a report on these matters at the Board of Trustees meeting scheduled for July 13. The President also requested that she submit a copy of this report to him in advance, pursuant to the existing procedure for presentation of all reports at trustees meetings. Dr. Jackson had asked to be permitted to make this report, but she refused to submit a copy in advance to Bertrand, stating that she did not want to be censored. The result was that Dr. Jackson was invited to attend the meeting but was not allowed to make her presentation.

In the fall of 1974, Dr. Jackson decided she wanted to be considered for promotion to full professor the following spring and submitted her name to the Faculty Committee on Promotion, Tenure, and Leaves of Absence (Promotion Committee). In accordance with the promotion procedure, the Promotion Committee requested Jackson's department chairman, Dr. Milton McDonald, to complete an Administrative Evaluation Form on Dr. Jackson. Dr. McDonald did so on October 21, 1974. In this form he described Dr. Jackson as "obviously well prepared for her classes" and "comparable in performance" to other associate professors he had worked with. He also commented that "Dr. Jackson has been elected to, or has been appointed on or has volunteered for most of the major responsibilities on the campus." Nevertheless, Dr. McDonald concluded that he could not recommend Dr. Jackson for promotion at that time, stating, "I feel Dr. Jackson has not yet achieved the professional maturity and judgment that should by typical of the full professor." Dr. Jackson was one of three professors in the Education and Psychology Department eligible for promotion at that time. Dr. McDonald did not recommend the promotion of any of the three and none were promoted.

That same day Dr. McDonald informed President Bertrand that he would not be able to recommend Dr. Jackson for promotion. Also on October 21, President Ber-

8. The report stated:

In view of the fact that as recent as Friday, April 19, the headline in the Atlanta Constitution read *Inflation at 10.8 Pct.*, the committee would like to respond to the third paragraph on page 3 of the president's letter which read–
In the March 30 discussion following adjournment, the trustees confirmed they would later consider allocating merit increases in the event sufficient nondesignated, unanticipated funds become available for use in 1974–75, and providing continuing funds are in sight to sustain those increases in future years.
–our response is that we hope that the development office is actively seeking sufficient nondesignated, unanticipated funds in order that additional pay raises can be made as early as the 1974 Fall Quarter. We are aware that Mr. Tickton, Berry's Educational Consultant, has emphasized during his two previous visits that the Berry faculty members are greatly underpaid. In fact, we are informed that when the Board of Visitors were on campus the weekend

of April 20–21 Mr. Tickton stated that a 10 percent raise should be the bare minimum considered for 1974–75. When studying the report of average salaries in U.S. colleges published in the April 29, 1974, *Chronicle of Higher Education*, the committee found that Berry has a number 4 rating in all reported categories; Berry's instructor's salaries were not reported. As you know, a number 4 is the lowest possible rating. Of course, the committee was interested and puzzled that Berry was reported in the IIB category which only includes colleges awarding bachelor degrees, since Berry offers master degrees in business, early childhood, and elementary education. If reported in category IIB, Berry would have a 3 rating while in category IIA, a 4 rating would be accurate. In conclusion, to be quite frank and explicit, many faculty members are suffering economically and desperately need more income. The committee would like to make a motion that these concerns about salaries be forwarded by letter from the Council Chairman to the President.

trand held a meeting with Board of Trustees Chairman William Bowdoin, Academic Dean Moran, Associate Academic Dean Ouida Dickey, Dr. McDonald and Dean of Administration and Development, John Lipscomb. The subject of this meeting was Dr. Jackson's application for promotion. Both the President and Dr. McDonald reported that they would be unwilling to recommend her for promotion at that time. Academic Dean Moran also voiced his doubts about Jackson's promotion. President Bertrand expressed his particular concern for the negative repercussions which might develop if Dr. Jackson, in the influential position of Chairman of the Faculty Council, should not become a full professor.

The conversation then turned to specific reasons for Bertrand's and McDonald's conclusions that Dr. Jackson was not yet ready for promotion. These reasons were again emphasized in the trial testimony of all persons present at this meeting.

The first reason was Dr. Jackson's lack of sufficient postgraduate work in her specific field. Dr. Jackson had a Bachelor of Science degree in physical education and a Master of Science and Doctor of Education degrees, mainly in the administration and supervision areas. Her primary teaching field, however, was methods and curriculum in Elementary and Secondary Education. She also taught some courses in Child and Adolescent Psychology and in Tests and Measurements, fields in which she had completed a few graduate courses but had not earned graduate degrees.

Bertrand and McDonald both felt that her lack of postgraduate degrees in her major fields of teaching was one reason she should not yet be promoted to full professor. Furthermore, they felt she had not made enough effort to continue her education in these fields, even though Dr. McDonald, her department chairman, had encouraged her to do so. In the words of Dr. McDonald, Dr. Jackson "is a person who does not have the scholastic background to be clearly identified as an outstanding scholar in the field of elementary and secondary curriculum, and methods. And that

is my concept of a full professor in any college or university."

The second consideration weighing against Dr. Jackson's promotion involved her former position as coordinator of the Student Teaching Program between Berry College and the Rome (Georgia) City Schools. Dr. Jackson had been appointed to this position against her wishes. Nevertheless, she had done the job for four years during which it had consumed a large part of her time. She resigned in 1974, after one or two squabbles arose between her and the administration of Berry. In the first place, Dr. Jackson was not following the proper procedure for placing student teachers. Instead of going through the main office of the Rome City School system, she would go directly to the teachers to ask them if they wanted student teachers placed under their supervision. Jesse Laseter, Superintendent of the Rome City Schools, had met with Dr. McDonald in May of 1974 and expressed his concern about this. McDonald told Laseter that Dr. Jackson would no longer be the Student Teacher Coordinator.

Actually, Dr. Jackson had resigned before this meeting between Laseter and McDonald, ostensibly because of another incident in which she felt favoritism was being shown in the placement of a Berry College professor's daughter as a student teacher. In her letter of resignation to Dr. McDonald, Dr. Jackson said: "In my 20 years of education, I have never seen a situation handled as poorly as you and Dr. Moran handled this one. . . . I only kept it [the coordinator's job] because I thought I could do a good job, but obviously after 4 years I find I must be the only one who thought so. . . ." Dean Moran testified that one concern expressed at the October 21 meeting was that the outcome of the student teacher coordinator incident indicated possible "vindictiveness" on Dr. Jackson's part which might resurface if she were not promoted to full professor.

The third, and obviously most decisive, reason why Bertrand and McDonald would not support Dr. Jackson for promotion to full professor was her inability to get along

with so many faculty members. The testimony of Bertrand, McDonald, Moran and Dickey is replete with incidents in which Dr. Jackson's behavior toward her colleagues was overassertive, tactless, or even hostile. We shall mention enough examples to support our conclusions without, we hope, giving the impression that this testimony was in any way catty or mean-minded.

Dr. Jackson openly and unjudiciously expressed her opinion that some of her colleagues were incompetent. She took it upon herself to tell Dr. McDonald that one member of the department was unhappy with the department and that another was not meeting her classes regularly. All of the above statements were either inaccurate or completely untrue. She told Dr. McDonald he was too busy to run the department himself and that she should be made chairman so that he could devote more time to his other duties. The relationship between Dr. Jackson and Mr. Dickey had deteriorated to the point that Dr. Jackson would not even speak to Dickey, a sorry state for the relationship between the Chairman of the Faculty Council and the Associate Academic Dean. Trustee Chairman Bowdoin's reaction when he learned of these incidents at the October 21 meeting was surprise that Dr. Jackson was still teaching at Berry, much less being considered for promotion to full professor.

At some time after this meeting, Academic Dean Moran expressed his reservations about Dr. Jackson to the Promotions Committee. Nevertheless, the Committee wanted to recommend her. In November, Moran met with the committee and they persuaded him to change his mind. On November 23, 1974, the Committee sent a letter to Moran in which Jackson was ranked first "according to priority" in their recommendations for promotion to full professor. A copy of this letter was sent to Bertrand. On March 18, 1975, Dean Moran officially recommended Jackson for promotion to Bertrand. Bertrand responded with a letter of April 4 in which he explained why he refused to recommend her.[9]

Thus, both Moran and the Promotion Committee recommended Jackson for promotion, to full professor. There is no concrete evidence, however, that either Dr. McDonald or President Bertrand ever changed their mind after their announcements at the October 21, 1974, meeting on this issue. Beginning in March 1975, the events set forth at the beginning of this opinion, including the "concerned forty" meeting and President Bertrand's speech to the Berry Schools employees, occurred. Dr. Bertrand did not recommend Dr. Jackson for promotion in the spring of 1975.

After reviewing all the evidence, the ALJ determined that Berry College had committed an unfair labor practice by failing to promote Dr. Jackson. In order to so find, the ALJ had to conclude that (i) Dr. Jackson was qualified for and should have received promotion and (ii) she was not promoted because of her protected concerted activities. The two questions are interre-

---

9. Dear Dean Moran:

I cannot recommend to the Board of Trustees at this time:

\*    \*    \*    \*    \*    \*

D. Joyce Jackson for promotion to professor,

\*    \*    \*    \*    \*    \*

Dr. Jackson without question is a tireless and enthusiastic worker greatly involved in worthwhile out-of-class activities on and off campus as much or more than other Berry College faculty members. She is now in her sixth year on the faculty at Berry, four years of which has been as associate professor. Her professional effectiveness in the past in working with public school teachers in the Rome community as an important part of her responsibility to Berry was so much questioned by the Rome City Schools superintendent that he was greatly relieved a year ago when she precipitously vacated her role as coordinator of student teachers. Furthermore, her chairman in the department of education and psychology does not even at this time recommend her for promotion to full professor, the highest faculty rank, which assumes not only demonstrated academic achievements and proven teaching ability but also seasoned maturity and stability in faculty deliberations. She must demonstrate her professionalism before I can recommend her to the Board of Trustees. I am most hopeful that I can later make such a recommendation to the board in her behalf.

lated, for an affirmative answer to the first is strong evidence that an affirmative answer to the second question will follow. On the other hand, if Dr Jackson was not, in the good faith opinion of the administration, qualified for promotion at that time, then her concerted activities were probably not the reason, or at most only one reason, why she was not promoted.

In ruling in Dr. Jackson's favor, the ALJ referred in detail to the superior rating so many "administrative persons" had given her performance as a teacher, the fact that her promotion from assistant to associate professor had come a year early, her outstanding record of extracurricular achievements on campus, and her rapport with the students. The ALJ also discredited much of the testimony given by members of the Berry College administration which was prejudicial to Jackson. Thus, the ALJ was convinced that Dr. Jackson should have been promoted.

Second, the ALJ concluded that President Bertrand's failure to promote Jackson was illegally motivated. The ALJ relied on inferences she made from the evidence that although Bertrand perhaps had decided back in October, 1974, to promote Jackson, this was not a final decision:

> In the first place, President Bertrand's own testimony reveals that he had *not* made a final decision on October 21, 1974, when (as discussed below) he and other college administrative officers met with Trustee Chairman Bowdoin specifically to consider Dr. Jackson's earlier faculty leadership role. Bertrand *twice* testified quite precisely that he was then reporting to Bowdoin his thinking "at that time." He testified:

> \*   \*   \*   \*   \*   \*

> I also find that President Bertrand had not previously decided to disapprove Dr. Jackson's promotion because at the time, he made *no* mention of an earlier decision.

> \*   \*   \*   \*   \*   \*

In Bertrand's April 4 letter [to Dean Moran in response to his March 8 letter], he gave the longest explanation for refusing to recommend Jackson's promotion to the Board. But in giving the detailed explanation (the basis for Bertrand's testimony at the trial), he failed to mention anything about an earlier decision being made, or to question why Moran made this recommendation in view of an earlier decision.

The ALJ then went on to assume that at some time between October 1974 and May 1975, Bertrand changed his mind in favor of Jackson's promotion, just as Dean Moran had done:

> I note that the promotion and tenure committee (the permanently composed advisory "Committee on Faculty Promotion, Tenure and Leaves of Absence") had not yet made a recommendation that Dr. Jackson be promoted to full professor. However, that committee had already contacted her department chairman, Vice President Milton McDonald, who had discussed her promotion with Bertrand. From his testimony, it appears evident that Bertrand anticipated that a favorable committee recommendation was forthcoming and he expected "criticism" if he refused to approve her promotion.

The ALJ also implied that Bertrand and Moran may have collaborated when they changed their minds:

> Moran and the committee exchanged views, and the committee on November 23, 1974, sent its formal recommendations to Moran, *with a copy to Bertrand*, stating that "Ranked according to priority," Jackson and another associate professor were recommended for the promotion to full professor. Thus, both Bertrand and Moran had the committee's top recommendation in November 1974 for Jackson's promotion. I consider it inconceivable that Moran and Bertrand did not discuss this recommended promotion between November 1974 and March when, despite Moran's knowledge of Bertrand's views at the time of the October 1974 meeting with Bowdoin, Moran listed Jackson's name first for promotion to full professor.

We remain mindful of the limited scope of the review we may make of the ALJ's findings. *Bayside Enterprises, supra: Hearst Publications, supra.* Likewise, we acknowledge that we must honor the Board's choice between "fairly competing inferences." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, 467–68 (1951); *NLRB v. Neuhoff Brothers Packers, Inc.*, 398 F.2d 640, 647 (5th Cir. 1968).

However, we find no support at all in the record for the ALJ's inferences quoted above. Thus, we cannot call them "fairly competing inferences," but only speculations unsupported by the evidence. Minus these impermissible inferences about events which might have happened "behind closed doors," the ALJ's ultimate conclusion that after October 21, 1974, Bertrand changed his mind to promote Jackson and then changed it back again when she became so involved in concerted activities in the spring of 1975, is clearly erroneous. The only conclusion which can logically be drawn from the evidence we have before us is that President Bertrand's mind was made up by October 21, months before the "concerned forty" meeting and its aftermath.

In the alternative, the ALJ found that, even if President Bertrand made his final decision back in October 1974, the failure to promote Jackson was still illegal because she had engaged in protected concerted activity even before that time and Bertrand's "primary motivation at that time was to penalize her for her protected concerted activities". This activity was Jackson's presentation of the report on Berry School salaries to the Faculty Council on May 28, 1974, the report to Bertrand and the subsequent request for a report from the administration on the salary ranges.

The ALJ here draws another inference that "the primary reason for President Bertrand calling the meeting with Trustee Chairman Bowdoin was to consider Dr. Jackson's participation in protected concerted activity as chairman of the faculty council." This limited inference is permissible since Dr. Bertrand admitted he called the October 21 meeting because he was concerned about the impact on the faculty of refusing to promote to full professor a person as influential as the Chairman of the Faculty Council. This could be interpreted as concern about the report Dr. Jackson had presented to the Faculty Council. And the presentation of this report, although far from being an effort to initiate union representation on campus, was intended to prepare for group action which would result in benefits for the employees as a group. *Dreis & Krump Manufacturing Co. v. NLRB*, 544 F.2d 320, 327 (7th Cir. 1976). Recognizing, on these fact inferences, that Jackson was at that time "engaged in concerted activity for the purpose of mutual aid and protection . . . ." *NLRB v. Buddies Supermarket, Inc.*, 481 F.2d 714, 717 (5th Cir. 1973); see also *Southwest Latex Corp. v. NLRB*, 426 F.2d 50, 56 (5th Cir. 1970), this is not enough to sustain the finding that refusal to promote was because of these activities.

However, even if this protected activity were a consideration on which Dr. Bertrand based his decision not to promote Jackson, it is one among a score of other incidents, none involving protected activity, which justifiably planted within the minds of Bertrand and the other members of the faculty great doubt as to whether Dr. Jackson was ready to tackle the job of full professor.

A failure to promote an employee is an unfair labor practice only if it is motivated by anti–union animus or as a reprisal for protected activities. Often we have held that if the real reason for an employee's discharge is his employer's discriminatory motivation, the fact that the employer also has a valid reason for firing the employee will not prevent the discharge from being considered an unfair labor practice. *E.g., Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1133 (5th Cir. 1971); *NLRB v. Big Three Industrial Gas & Equipment Co.*, 405 F.2d 1140, 1142 (5th Cir. 1969); *NLRB v. Linda Jo Shoe Co.*, 307 F.2d 355, 357 (5th Cir. 1962). It is proper to apply the same standard to promotions which are also covered by § 7 of the Act.

■ But this does not mean that an employee who truly deserves to be discharged or held back from promotion can engage in one incident of protected concerted activity and then expect that her shortcomings on the job will never catch up with her. If there is substantial evidence in the record to indicate that the employer would have taken the same action even if there had been no concerted activity, then the valid reason is not a mere pretext and the discharge or, in this case, the failure to promote is not due to forbidden discrimination. As Judge Wisdom explained in *Frosty Morn Meats, Inc. v. NLRB*, 296 F.2d 617, 621 (5th Cir. 1961):

> If in the absence of a discriminating motive the employee would not have been fired, his discharge deprives him of a right he otherwise would have had to continue his job while participating in union activities. Such discharges make other employees apprehensive that if they join a union they endanger their jobs. The inquiry must be made even where the discharged employee has done something that might warrant his discharge, since if it is something that the employer might pass over in another instance the firing of the union employee can be discriminatory. If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part. The employee will not have been harmed by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. It must be remembered that the statute prohibits discrimination, and that the focus on dominant motivation is only a test to reveal whether discrimination has oc-

curred. Discrimination consists in treating like cases differently.

*See also Nix v. NLRB*, 418 F.2d 1001, 1005–06 (5th Cir. 1969); *NLRB v. Neuhoff Brothers Packers, supra*, 398 F.2d at 645–47.

The evidence in this case of other very good reasons not to promote Dr. Jackson is too overwhelming to conclude that had Dr. Jackson not engaged in this protected activity she would have been promoted. In the face of this, the evidence is too thin to accept the conclusion that Dr. Bertrand's primary purpose in denying her promotion was to discriminate against her because of one possible incident of protected concerted activity which occurred before his decision was made.

The decision to promote or not to promote an associate professor to full professor status is based on many more considerations than just the amount of time the associate professor has spent with the college. A professor is a professional who must combine many qualities to carry out her job. These qualities–scholarly achievement, skill at conveying the knowledge to the student, active concern for the department and college as a whole, and the ability to work well with other professors and the administration to achieve all of the above goals–can only be evaluated by a professor's superiors in the college administration.

■ Taking into account the non–industrial nature of a college or university, the Board, in interpreting the facts de novo, and this Court, on review, must give some deference to the discretion of the administration in determining who among the ranks of associate professors will achieve the distinct honor of full professorship. *See NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).[10]

---

10. In *Yeshiva University* the Supreme Court affirmed the Second Circuit holding that the entire full–time faculty of a private university was managerial personnel who, like supervisors, are exempt from the protection of the Act. See *Bell Aerospace, supra.* We reversed the ALJ in the case before us strictly on the facts and do not reach the issue of whether, in any event, Dr. Jackson, simply as a faculty member, would have been exempt from protection of the Act because of her possible managerial status.

*Yeshiva University* was a holding based to a great part on the extended particular facts of that case. Yeshiva University is run on a truly collegial basis. As a group, the Yeshiva faculty truly manages its school.

Although in the different context of a direct action under the First Amendment, this Court has described the restraints as we review a university's decisions concerning the hiring, discharge, tenure or promotion of a professor.

This Court does not sit as a reviewing body of the correctness or incorrectness of the Board of Regents' decision in granting or withholding tenure. This is founded on the policy that federal courts should be loathe to intrude into internal school affairs.

*Megill v. Board of Regents of State of Florida,* 541 F.2d 1073, 1077 (5th Cir. 1976). *See also Powell v. Syracuse University,* 580 F.2d 1150, 1153 (2d Cir. 1978); *Ayers v. Western Line Consolidated School District,* 555 F.2d 1309, 1319 (5th Cir. 1977); *Blunt v. Marion County School Board,* 515 F.2d 951, 956 (5th Cir. 1975).

In this case the employer has demonstrated several very good justifications for its decision not to promote Dr. Jackson. The record does not adequately sustain the burden of demonstrating that these reasons were pretextual and a causal connection between the antiunion attitude of the employer and the failure to promote. *See Syncro Corp. v. NLRB,* 597 F.2d 922, 924 (5th Cir. 1979); *Florida Steel Corp. v. NLRB,* 587 F.2d 735, 742 (5th Cir. 1979); *NLRB v. Red Top Cab & Baggage Co.,* 383 F.2d 547, 553–54 (5th Cir. 1967).

Judging from the record as a whole, we conclude that the Board erred in holding that there was a discriminatory purpose in failing to promote Dr. Jackson. We will not enforce that part of the Board's order placing Dr. Jackson in the position of full professor at Berry College and awarding her back pay.

ENFORCEMENT OF ORDER GRANTED IN PART AND DENIED IN PART.

The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these.

To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and the customers who will be served.
*Yeshiva University, supra,* 444 U.S. at 686, 100 S.Ct. at 864, 63 L.Ed.2d at 127–28.

The ALJ's holding in the instant case that Dr. Carper, as chairman of his department was a superior, and our affirmance of that holding, imply that he made supervisory decisions and that perhaps the departments at Berry College were not run on a *Yeshiva* collegial basis. Of course, as the term "managerial" is defined in *Bell Aerospace* and *Yeshiva University,* Dr. Carper would also be a manager.