The BERRY SCHOOLS, Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

No. 79–1266.

United States Court of Appeals, Fifth Circuit.
Unit B

Aug. 17, 1981.

---

Fisher & Phillips, Robert W. Ashmore, Richmond Mason Barge, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, Deputy Associate, Gen. Counsel, Howard E. Perlstein, N. L. R. B., Washington, D. C., for respondent, cross-petitioner.

Before GEWIN *, RONEY and HATCHETT, Circuit Judges.

RONEY, Circuit Judge:

This case is before the Court on petition for review and cross-application for enforcement of an order of the National Labor Relations Board finding The Berry Schools committed an unfair labor practice by granting only a substandard salary increase to Dr. N. Gordon Carper for the 1977–78 academic year. Because there is insufficient evidence in the record to support the Board's finding that the action was in retaliation for Carper's protected concerted activity, we set aside the Board's order and deny enforcement.

Briefly stated, the facts are these. Dr. Carper joined the faculty of Berry College in 1965 as Assistant Professor of History and Chairman of the Social Science Department. He was subsequently promoted to full professor, awarded tenure and named one of four Dana Professors, a distinguished chair. In March 1975 Carper attended an informal meeting of approximately forty faculty members to discuss salary increases. This group, termed the "Concerned Forty," appointed Carper chairman of an *ad hoc* committee to investigate the possible advantages of collective bargaining for the faculty. The committee met twice but never made a report. After being made aware of these activities, the President of Berry College, Dr. John R. Bertrand, gave a speech before the faculty and staff explaining why he believed collective bargaining was inappropriate at Berry. He referred in his speech to a "small power bloc" allegedly maneuvering to gain control over the faculty. Shortly thereafter Carper was replaced as chairman of the Social Science Department and the faculty member who had organized the Concerned Forty meeting, Dr. Joyce Jackson, was denied promotion to full professorship.

Initially, The Berry Schools was charged with violating section 8(a)(1) of the National Labor Relations Act (Act), 29 U.S.C.A. § 158(a)(1), for demoting Carper and failing to promote Dr. Jackson. The Board ruled that Carper, as department chairman, was not protected by the Act because he exercised supervisory powers, but that failure to promote Jackson was in reprisal for her attempts to engage in protected activity. *The Berry Schools*, 234 N.L.R.B. No. 145. In *The Berry Schools v. NLRB*, 627 F.2d 692 (5th Cir. 1980) (*Berry I*), this Court affirmed the Board's ruling as to Carper but reversed the finding of an unfair labor practice as to Jackson because there were legitimate reasons for not promoting her and President Bertrand had decided not to promote her several months before she engaged in protected activity.

* This case is being decided by a quorum due to the death of Judge Gewin on May 15, 1981. 28 U.S.C. § 46(d).

After he was removed as department chairman, Carper continued to speak out regarding certain administration practices. In particular, during faculty meetings in January and February of 1977, he advocated a ten percent salary increase for all faculty and renewal of a sabbatical program. These suggestions were overwhelmingly endorsed by the faculty.

Friction developed between Carper and his replacement as department chairman, Dr. Robert Geisel. As part of the salary review process Geisel was required to evaluate each member of his department at the beginning of each year, based on his previous year's performance. In January 1977, Geisel rated Carper as "below average," the lowest possible ranking. The Associate Dean for Arts and Sciences, Dr. Barbara Abels, also was to make an independent evaluation of each professor in Geisel's department. She too rated Carper as below average. These evaluations were sent to the Vice President and Dean of Academic Affairs, Dr. Doyle Mathis. Although Mathis could add his own evaluation if he disagreed with the prior two, he did not make an independent evaluation of Carper. Mathis then met with two other administrators, the Director of Management and Planning and the Controller, to determine tentative salary increases for each faculty member. The tentative increases were submitted to President Bertrand, who approved a $700 increase for Carper without question. The $700 represented a 3.35 percent increase for Carper. The average percentage increase for all continuing faculty for 1977–78 was 6.21 percent.

While the decision of this Court in *Berry I* was pending, the instant action was initiated charging that Carper's failure to get a larger salary increase was motivated by unlawful animus. Although the Administrative Law Judge (ALJ) concluded there was insufficient evidence in the record to show that Carper had been discriminated against because of his protected activity, the Board reversed.

■ Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of rights" protected by the Act. An employer's denial of part or all of an employee's salary increase for engaging in protected activity is a violation of section 8(a)(1). *See NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 97–99 (5th Cir. 1970).

■ The Board's ruling that an unfair labor practice has been committed must be sustained by the Court if it is supported by substantial evidence in the record:

If the Board's decision is based upon such relevant evidence as might be accepted as adequate by a reasonable person, we are not at liberty to deny enforcement merely because the evidence may also reasonably support other conclusions or because we might have reached a different conclusion had the matter come before this Court de novo. *NLRB v. United Insurance Co.,* 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *NLRB v. O. A. Fuller Super Markets, Inc.,* 374 F.2d 197 (5th Cir. 1967); *NLRB v. Camco, Inc.,* 369 F.2d 125 (5th Cir. 1966). Although the scope of our review is thus limited, we may deny enforcement of an order of the Board if, after full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's decision is substantial. *Universal Camera Corp. v. NLRB,* 340 U.S. [474] at 488, 71 S.Ct. 456 [95 L.Ed. 456] [(1951)]; *NLRB v. O. A. Fuller Super Markets, Inc.,* 374 F.2d at 200.

*NLRB v. Mueller Brass Co.,* 509 F.2d 704, 706–07 (5th Cir. 1975). Moreover, where the Board has reversed a decision of the ALJ finding no unlawful behavior, the Court has an obligation to examine the evidence and findings of the Board more critically than if the two were in agreement. *NLRB v. Florida Medical Center, Inc.,* 576 F.2d 666, 674 (5th Cir. 1978).

Carper's substandard salary increase could properly result from his poor evaluation. The ALJ found, and the Board did not dispute, that Carper was not discriminated against in comparison with other professors who received a below average evaluation. Of the ten professors so rated, only

one received a salary increase of more than $700 ($850 or 4.4 percent) and four received no raise at all (one contract was not renewed).

The Board, however, decided the poor evaluation was illegally motivated, a conclusion based on timing. Prior to 1976, Carper had consistently been rated as above average ("excellent" or "good to excellent" on the scale used in previous years). The Board found that Carper continued to perform as an outstanding professor during 1975 and 1976 and should have been rated as above average. In light of its finding that Carper was engaged in protected activity at the time and that Berry College had expressed animus toward such activity, the Board determined that a prima facie case of discrimination could be inferred. The Board discredited Berry College's stated reasons for rating Carper below average. It is this determination of the Board that is unsupported by the record. The General Counsel failed to show the stated reasons were pretextual and therefore failed to sustain its burden of proving by substantial evidence that the substandard salary increase was unlawfully motivated. *See Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1259 (5th Cir. 1978); *Frosty Morn Meats, Inc. v. NLRB*, 296 F.2d 617 (5th Cir. 1961).

The department chairman, Dr. Geisel, testified he evaluated Carper as below average in 1977 because of what he perceived as Carper's hostile and uncooperative attitude toward him and within the department generally after his 1975 demotion. Geisel stated that in making evaluations he gave heavy weight to the teaching performance of the faculty member and that he considered "relations with the college, duties within a department, advising, and of course, class activities themselves" particularly important. Geisel cited numerous examples of Carper's alleged poor attitude after he was replaced as department chairman: refusing to give up the chairman's office; failing to return departmental forms on time; making derogatory statements about recently hired department members; submitting a grade for a student

he was not assigned to supervise; not following department rules concerning the handling of student evaluation forms; not keeping scheduled office hours; complaining about teaching an 8:00 a. m. class; intimidating student advisees; using class time to criticize The Berry College administration; and changing class times without following the proper procedures. Geisel also testified he could not recall a single member of the department who had not complained to him about Carper's attitude. The magnitude of Geisel's dissatisfaction with Carper was evidenced by the fact he recommended that Carper not be continued in his position, although he noted that Carper held tenure.

Carper testified regarding many of these problems. The ALJ sided with Carper in most instances and concluded that Geisel had not acted objectively in evaluating Carper as below average. Nevertheless, the ALJ found that Geisel believed the problems to be real and that his evaluation was made in good faith based upon such belief and not upon Carper's protected activity. The Board deferred to this finding of the ALJ, which was amply supported by the record (regardless of who was right or wrong as between Geisel and Carper). It nonetheless found an unfair labor practice because each of the other administrators involved in the evaluation process accepted the subpar evaluation without question.

The ALJ drew no specific conclusions regarding Associate Dean Abels' evaluation of Carper. Abels testified that her 1977 evaluations were based on the ratings given by the department chairman, a desire to achieve uniformity between departments, and her own independent knowledge of the faculty member. Since she was new in her position, Ables said she gave rather heavy weight to the department chairman's evaluation, making a different evaluation only if she had reason to believe the chairman was wrong. Thus, she gave eight evaluations exactly the same as Dr. Geisel and gave only one professor a different (and higher) evaluation.

With regard to Dr. Carper, Abels mentioned four factors from her personal knowledge which led her to believe Geisel's below average evaluation was appropriate: (1) Carper's workload was among the lowest of the fulltime faculty in his department; (2) he changed the meeting time for some of his classes; (3) he complained bitterly about being required to teach an 8:00 a. m. class; and (4) from her exposure to informal student conversations, she felt student feeling toward Carper's teaching in 1976 was not particularly good.

The Board failed to consider this last stated reason and discounted the other three as not supported by the record. The Board found that Carper's workload was actually above average and that Geisel had approved the one documented class change. It further found Carper had reason to complain about teaching the 8:00 a. m. class and that the College had acted unreasonably in this regard.

It is unnecessary for the Court to scrutinize in detail the Board's findings as to what actually occurred. It is sufficient to say the testimony was conflicting with regard to Carper's workload and his request for time changes and the Board was entitled to draw the conclusions it did. Regardless of what was true in fact, however, the Board did not find, nor could it on the record, that Abels did not in good faith believe the stated reasons to be true. She testified the records showed that Carper taught the absolute minimum number of required hours in 1976. No documentary evidence was offered to dispute this testimony. Although Carper stated his workload in fact was rather heavy because of the number of upper level preparations, Abels was not questioned about this.

Whether or not Geisel eventually approved Carper's request for a class change, it is clear from the record that a confrontation had occurred and that Geisel believed Carper had acted improperly. Again, there is no record evidence from which the Board could conclude that Abels did not reasonably believe the incident occurred.

■ Finally, in rejecting Abels' testimony regarding the 8:00 a. m. class the Board stated, "[a]s to his 'complaining bitterly' about teaching an 8:00 a. m. class, the Administrative Law Judge found, and we agree, that Dr. Carper had reason to argue against the setting of that class for that time and that the administration should have understood his concerns." The Board's analysis completely misses the mark. Whether the school acted unreasonably or made a bad managerial decision in requiring Carper to teach the course at 8:00 a. m. is totally beside the point. The only relevant question is whether Abels in good faith based her evaluation on the belief that Carper's complaints were unfounded. As this Court has often stated,

> The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the [unfavorable action] is evaluated in terms of its reasonableness. . . . But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can [take unfavorable action] for good cause, or bad cause or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific definite qualification: it may not [take unfavorable action] when the real motivating purpose is to do that which Section 8(a)[(1)] forbids.

*Florida Steel Corp. v. NLRB*, 587 F.2d 735, 745 (5th Cir. 1979) (*quoting NLRB v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956)).

■ After a thorough review of the record, we cannot find sufficient evidence to permit the Board to conclude that Abels' evaluation was illegally motivated. Although some of Abels' stated reasons may not have been true in fact, there is simply no evidence from which to infer that she did not believe them to be accurate. Abels herself did not express any animus toward the exercise of protected rights and it would be pure speculation to say her evaluation was based on Carper's protected activity. An unlawful purpose is not lightly to be inferred. "Mere suspicions of unlawful

motivation are not sufficient to constitute substantial evidence." *Federal-Mogul Corp.*, 566 F.2d at 1259.

 The Court is not unaware of the difficulty of proving pretext. In the context of this case, however, where it is clear that problems existed between Geisel and Carper, and where there is no other evidence showing the administrators did not or could not in good faith have believed the problems to be real, this showing alone is insufficient to rebut the College's explanation for the evaluation.

Although the Board discredited certain justifications offered by the other administrators for Carper's below average evaluation, these individuals were primarily involved in setting the actual salaries and not in determining or reviewing the evaluations received. Dean Mathis was the only administrator other than Abels and Geisel who could add his own evaluation. His testimony as to why he did not make an independent evaluation of Carper was credible and this failure alone is insufficient to support a finding of unlawful motivation.

Thus, the only support in the record for finding an unfair labor practice is the College's knowledge of Carper's protected activity and its biased attitude. General bias, however, without any specific evidence that Carper's substandard salary increase was unlawfully motivated, cannot support a finding of an unfair labor practice. "An unlawful motivation ... cannot be based solely on the general bias or anti-union attitude of the employer, whether proved or conceded, but must be established by other facts in each individual case." *Florida Steel Corp.*, 587 F.2d at 744. *See NLRB v. Speed Queen*, 469 F.2d 189, 194 (8th Cir. 1972); *NLRB v. Dan River Mills, Inc.*, 274 F.2d 381, 384 (5th Cir. 1960). The decision of the department chairman and the associate dean to evaluate Carper as below average may not have been a good or reasonable one, but so long as it was not in retaliation for protected activity the Board had no jurisdiction to question it. As suggested in *Berry I*, the courts and the Board should be loathe to intrude into the internal affairs of a college or university, particularly in regard to its academic judgments, absent a clear showing that an unlawful practice has occurred. 627 F.2d at 706. Without substantial evidence in the record as a whole from which the Board could reasonably infer a causal connection between Berry College's anti-organizational attitude and Carper's substandard evaluation and salary increase, *see Mueller Brass Co.*, 509 F.2d at 711, we decline to enforce the Board's order.

ORDER SET ASIDE; ENFORCEMENT DENIED.